**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee*,

v.

ESTEFANI ZARAGOZA-MOREIRA,
        *Defendant-Appellant*.

No. 13-50506

D.C. No.
3:12-CR-00618-
WQH-1

OPINION

On Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted
February 5, 2015—Pasadena, California

Filed March 18, 2015

Before: Stephen Reinhardt and Ronald M. Gould, Circuit
Judges, and Robert W. Gettleman, Senior District Judge.[*]

Opinion by Judge Gettleman

---

[*] The Honorable Robert W. Gettleman, Senior United States District
Judge for the Northern District of Illinois, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel reversed the district court's denial of a motion to dismiss an indictment charging importation of methamphetamine, in a case in which the defendant asserted that the government destroyed potentially useful evidence – video footage of a Port of Entry pedestrian line – that might have supported her claim of duress.

The panel held that the defendant's due process rights were violated because a Homeland Security agent, whose probable cause statement omitted any reference to the defendant's claims of coercion or to her alleged conduct while waiting in the pedestrian line, knew of the potential usefulness of the video and acted in bad faith by failing to preserve it. The panel concluded that the defendant is unable to find comparable evidence to support her duress defense, and remanded with directions to dismiss the indictment.

### COUNSEL

Harini P. Raghupathi (argued), Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant.

Laura E. Duffy, United States Attorney, Bruce R. Castetter and Randy K. Jones (argued), Assistant United States Attorneys, San Diego, California, for Plaintiff-Appellee.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

# OPINION

GETTLEMAN, Senior District Judge:

Defendant Estefani Zaragoza-Moreira ("Zaragoza") conditionally pled guilty to importing methamphetamine into the United States in violation of 21 U.S.C. §§ 952 and 960. She now appeals the district court's denial of her motion to dismiss the indictment on the basis that the government destroyed potentially useful evidence that might have supported her claim of duress. Zaragoza argues that the district court erred by finding that the government did not act in bad faith and, consequently, did not violate her due process rights in failing to preserve the evidence. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.

# BACKGROUND

In the early morning hours of December 22, 2011, Zaragoza entered the pedestrian line for admission into the United States from Mexico at the San Ysidro, California, Port of Entry. At the primary inspection booth, Zaragoza handed Customs and Border Protection ("CBP") Officer Grant Patterson her United States passport. Officer Patterson observed that Zaragoza was traveling with another woman, and that the two women were standing "shoulder to shoulder." Based on a computer-generated referral, Officer Patterson sent Zaragoza to a secondary inspection.

CBP Officer Nancy Cervantes, who was conducting secondary inspections, immediately put on gloves to pat Zaragoza down. Prior to beginning the pat down, Officer Cervantes asked Zaragoza whether she had any weapons or

sharp objects on her body.  In response, Zaragoza "blurted []
out" that she had packages on her.  Officer Cervantes
subsequently removed a package from Zaragoza's lower back
containing .34 kilograms of heroin and a package from her
abdomen containing .42 kilograms of methamphetamine.

Following her arrest, Zaragoza was interviewed by
Homeland Security Investigations ("HSI") Agent Ashley
Alvarado over the course of an hour.  The interview was
video recorded and later transcribed.  During initial
background questioning, Zaragoza informed Alvarado that
when she was 13 she had been shot multiple times, including
in the head, in a gang-related incident, resulting in memory
and cognitive problems.[1]  Zaragoza also told Alvarado that
she had taken drugs in the past 24 hours, and that while she
was unsure what kind of drugs she had used, "they made [her]
sniff it" and "it made [her] feel weird."

Following preliminary questioning, Alvarado explained
that the purpose of the interview was "to get [Zaragoza's]
side of the story," and that "the hard part is over" because she
had "already been caught."  Zaragoza responded: "Yeah, I
made it obvious. I was making — I wanted to be known. I
didn't want to do it." Zaragoza proceeded to explain that she
was not paid to cross the drugs into the United States, but
instead that she had "want[ed] to go home."  Zaragoza told

---

[1] In May 1999, Zaragoza was shot in the left arm, back, and head by
rival gang members and run over by a vehicle. As a result of the shooting,
Zaragoza suffers from seizures, depression, and memory loss.
Psychological evaluations indicate that Zaragoza's overall cognitive and
adaptive skills fall in the "mild range of mental retardation," and that she
suffers from a loss of intellectual functioning capacity.  Zaragoza's
adaptive skills resemble those of an average 8 year old.

Alvarado that she had been in Tijuana for three days, after traveling there to party with her friend Karen.

Zaragoza explained to Alvarado that after spending three days in Mexico she had run out of money and wanted to return home to the United States.  At this time, two of the men she was with, Hernan and Chino, who were allegedly connected to the "Antrax of El Mayo" drug cartel, began pressuring her to tape drugs to her body when she crossed the border.  The plan was that Hernan would accompany Zaragoza to the border and then meet her at a restaurant to retrieve the drugs after she had entered the United States. Zaragoza claimed that she originally resisted carrying the drugs, telling the men that she "didn't want to do it," but that the two men and her friend Karen continued to pressure her. Zaragoza eventually relented, allowing Karen to help strap the packages of drugs to her body.  According to Zaragoza, Karen did not carry any drugs across the border.

Zaragoza insisted that while in the pedestrian line she "wanted [the authorities] to notice [her], so she tried to attract attention by "making a lot of noises so I could be noticed," and by making herself "obvious."  Zaragoza demonstrated to Alvarado the motions she allegedly made so that border inspectors would notice her, stating that she "was making so many things like so they could notice there was something wrong with me."  Zaragoza also claimed that she had been in the pedestrian line earlier that morning, around 4:00 a.m., but that Chino and Karen had taken her out of the line because she had purposely tried to loosen the packages of drugs that were attached to her body.  She stated that she had "wiggled around," "patted her stomach," and "threw her passport on the ground" to draw attention to herself while in line.  Karen allegedly told Zaragoza to "calm down" because she was

"making it obvious." Zaragoza explained to Alvarado that she did not directly alert border inspectors because she "was scared because Karen was with [her]" in the line.

According to Zaragoza, Chino and Hernan did not offer her any money to cross the drugs, but stated only that if she did it, "nothing's going to happen to [her] daughter or [her] mother." Zaragoza told Alvarado that she was in the pedestrian line for about 40 minutes prior to reaching the primary inspection booth. Zaragoza denied knowing what type of drugs she was transporting, stating that she did not ask Hernan or Chino because "[t]hey're going to get paranoid and they're going to kill me." Before the end of the interview with Alvarado, Zaragoza again insisted that "I made myself obvious. I made myself obvious a lot. I made myself obvious." In response to Alvarado's questions regarding why she was carrying Santa Muerte paraphernalia, a saint commonly believed to protect and guide drug traffickers, Zaragoza explained that the saint held a different meaning to her, and that "if I want[ed] to not get caught, why was I making myself obvious?"

During the interview, Zaragoza also told Alvarado that she had previously been in Mexico for four months, staying with Karen and Karen's cousins, Juan and Junior. Zaragoza stated that during that time, she "couldn't leave," because "they took [her] money," and that every time she sought to return to the United States, Karen's cousins convinced her to stay. She also stated that she did not return to the United States because she had fallen in love with one of the cousins' friends. She claimed that during this four month stay, Juan and Junior tried to convince her to cross people and drugs into the United States, but she had refused. When Alvarado probed for more information about Karen and her cousins,

Zaragoza was hesitant, explaining that she was scared because "these people are really dangerous," and had connections "to the cartel."

A criminal complaint charging Zaragoza with importing heroin and methamphetamine into the United States was issued on December 23, 2011. The complaint was based in part on Alvarado's probable cause statement, which stated that Zaragoza admitted to attempting to smuggle narcotics into the United States, but omitted any reference to Zaragoza's claims of coercion or to her alleged conduct while waiting in the pedestrian line. Five days later, on December 28, 2011, Zaragoza's attorney sent a letter to the Assistant United States Attorney ("AUSA") assigned to the case requesting the preservation of evidence. The letter stated that "defendant specifically requests that any and all videotapes . . . that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest [of Zaragoza] in this case be preserved."

Zaragoza was subsequently indicted by a grand jury of one count of importing heroin and one count of importing methamphetamine. On February 23, 2012, Zaragoza's counsel filed a motion to compel discovery and preserve evidence, specifically referencing the video recordings at the Port of Entry. Following a hearing on February 27, 2012, the district court ordered the government to preserve the video evidence. In line with the court's order, on February 28, 2012, the United States Attorney's Office ("USAO") requested the Port of Entry video footage from the day of Zaragoza's arrest. However, U.S. Customs and Border Protection informed the USAO that the video footage from December 22, 2011, had been destroyed around January 21, 2012, after it had been

automatically recorded over within 30 to 45 days of Zaragoza's arrest.

Zaragoza moved to dismiss the indictment due to the government's destruction of the video footage. Zaragoza's motion was denied following a hearing in which Zaragoza, CBP officers Patterson and Cervantes, and Agent Alvarado testified. Zaragoza subsequently entered a conditional plea of guilty, reserving the right to appeal the district court's denial. This appeal follows.

## STANDARD OF REVIEW

The district court's holding that Zaragoza's due process rights were not violated by the government's failure to preserve potentially exculpatory evidence is reviewed *de novo*. *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013). Factual findings, such as the district court's finding that the government's actions did not amount to bad faith, are reviewed for clear error. *Id.* "'[R]eview under the clearly erroneous standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed.'" *McMilan v. United States*, 112 F.3d 1040, 1044 (9th Cir. 1997) (quoting *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 623 (1993)).

## DISCUSSION

Zaragoza argues that the government's failure to preserve the Port of Entry video footage from the morning of her arrest violated her due process right to present a complete defense. In *California v. Trombetta*, 467 U.S. 479, 489 (1984), the Supreme Court held that "the government violates the

defendant's right to due process if the unavailable evidence possessed 'exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *United States v. Cooper*, 983 F.2d 928, 931 (1993) (quoting *Trombetta*, 467 U.S. at 489). The Court subsequently added a third requirement for establishing a due process violation in *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988), holding that the defendant must demonstrate that the government acted in bad faith in failing to preserve the potentially useful evidence. *See also Cooper*, 983 F.2d at 931.

As this court explained in *Cooper*, "*Youngblood's* bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction." *Id.* The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith. *Youngblood*, 488 U.S. at 56 n.*; *Sivilla*, 714 F.3d at 1172; *United States v. Leal-Del Carmen*, 697 F.3d 964, 970 (9th Cir. 2012) ("When the government doesn't know what a witness will say, it doesn't act in bad faith in deporting him . . . . The question of bad faith thus turns on what the government knew at the time it deported the witness.").

Applying the requisite test above, the district court found that while the video footage was potentially useful evidence, its exculpatory value was not readily apparent to Agent Alvarado. Without addressing the AUSA's actions, or lack thereof, in light of the December 28, 2011, letter from

defense counsel requesting the preservation of video evidence, the district court held that "[t]he facts and circumstances of this case do not support a finding that Agent Alvarado or counsel for the government destroyed potentially exculpatory evidence in bad faith."

Zaragoza concedes on appeal that the destroyed video footage was not materially exculpatory, but was, as found by the district court, potentially useful evidence. While the government does not admit that the evidence was potentially useful, it does not present any argument to the contrary. Potentially useful evidence, as defined in *Youngblood*, is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57.

Here, the issue is whether the video footage of the Port of Entry pedestrian line on December 22, 2011, was potentially useful to Zaragoza's duress defense. Duress is "a common-law defense that allows a jury to find that the defendant's conduct is excused, even though the government has carried its burden of proof." *United States v. Kuok*, 671 F.3d 931, 947 (9th Cir. 2012) (citing *Dixon v. United States*, 548 U.S. 1, 12–14 & n.9 (2006)). "To establish duress, the burden of proof is on the defendant to show that: (1) he was under an immediate threat of death or serious bodily injury, (2) he had a well grounded fear that the threat would be carried out, and (3) he had no reasonable opportunity to escape." *Id.* (citing *United States v. Shapiro*, 669 F.2d 593, 596 (9th Cir. 1982)). To satisfy the third element, it is relevant whether the defendant had an "opportunity to surrender to the authorities on reaching a point of safety." *United States v. Ibarra-Pino*, 657 F.3d 1000, 1005 (9th Cir. 2011). A defendant "must

present some evidence indicating that he 'took the opportunity to escape the threatened harm by submitting to authorities at the first reasonable opportunity.'" *Id*. (quoting *United States v. Contento-Pachon*, 723 F.2d 691, 695 (9th Cir. 1984)).

As the district court found, the destroyed video was potentially useful evidence to support defendant's claim of duress. The video footage may have shown Zaragoza throwing her passport on the ground, trying to loosen the packages of drugs from her body, Karen and Chino removing her from the pedestrian line, and other behavior that Zaragoza allegedly engaged in to make herself "obvious" to law enforcement. Such evidence, especially Zaragoza trying to attract the attention of the border inspectors, would be particularly helpful to Zaragoza establishing the third element of her duress claim. The video may have also shed light on the extent to which Karen was overseeing and controlling Zaragoza, and whether it would have been feasible for Zaragoza to have alerted border inspectors to the contraband at an earlier time. As such, the district court correctly found that the video footage was "potentially useful evidence."

The district court, however, clearly erred in finding that the exculpatory value of the video footage of the Port of Entry pedestrian line was not readily apparent to Agent Alvarado. As discussed above, when potentially useful evidence has been destroyed by the government, the bad faith inquiry initially "turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Sivilla*, 714 F.3d at 1172 (internal quotes omitted); *Leal-Del Carmen*, 697 F.3d at 970; *Cooper*, 983 F.2d at 931. A review of the interview transcript establishes Agent Alvarado's knowledge of the potentially

exculpatory value of the pedestrian line video before it was destroyed.

From the beginning to the end of Agent Alvarado's hour-long interview with Zaragoza, Zaragoza repeatedly alerted Alvarado to her duress claim and the potential usefulness of the pedestrian line video footage. *See Cooper*, 983 F.2d at 931 (finding bad faith where the destroyed evidence's "value as potentially exculpatory evidence was repeatedly suggested to government agents"). Shortly after questioning began, when asked to tell her side of the story, Zaragoza stated "[y]eah, I made it obvious. I was making — I wanted to be known. I didn't want to do it." Thereafter, Zaragoza repeatedly stated throughout the interview that she had tried to attract the attention of the authorities while in the pedestrian line by "making a lot of noises so I could be noticed," and by making herself "obvious."

Zaragoza explained to Agent Alvarado that she had initially been in the pedestrian line around 4:00 a.m. on December 22, 2011, but had been removed from the line by Chino and Karen after intentionally loosening the packages of drugs taped to her body and engaging in other attention-seeking behavior. Zaragoza demonstrated to Agent Alvarado the motions she allegedly made to indicate to border agents that "there was something wrong with me" and explained that she had "wiggled around," "patted her stomach," and "thrown" her passport on the ground" to draw attention to herself while in line. As the interview wound down, Zaragoza continued insisting that "I made myself obvious. I made myself obvious a lot. I made myself obvious," and stated that "if I want[ed] to not get caught, why was I making myself obvious?"

Despite Agent Alvarado's testimony that she "overlooked" retrieving the video footage because it was "just something I didn't think about doing," Alvarado undoubtedly appreciated the significance of Zaragoza's claims during the interview. While discussing Zaragoza and Karen's interactions in the pedestrian line, Alvarado asked Zaragoza how long she had waited in line, to which Zaragoza indicated that she had been in the pedestrian line for about 40 minutes. Agent Alvarado also asked Zaragoza why she did not alert border inspectors to the drugs earlier, and Zaragoza explained that she was "scared because Karen was with me." Alvarado then followed up, asking Zaragoza if Karen was "right next to [her]," if the two had been in the "same lines," and if Karen was "right there." Later on, Alvarado confirmed that "Karen was right behind you in the same line?"

Agent Alvarado obviously recognized the importance of Zaragoza's statement that Karen was with her in the pedestrian line. Indeed, Alvarado asked the question in the first place. She also repeated the question numerous times, confirming Zaragoza's answer, which she would not have done if she thought the answer was inconsequential. *See Leal-Del Carmen*, 697 F.3d at 970. Although the district court recounted a number of other statements Zaragoza made during the interview that may have weakened Zaragoza's duress claim, the strength of her defense and whether Alvarado believed the claim do not diminish the potential usefulness of the video. *Cooper*, 983 F.2d at 933 ("[Defendants] should not be made to suffer because government agents discounted their version and, in bad faith, allowed its proof, or its disproof, to be buried in a toxic waste dump.").

The government argues that even if the video footage was potentially useful evidence and Agent Alvarado was aware of its exculpatory value, the government did not act in bad faith in failing to preserve the evidence because it did not "purposefully destroy the evidence to gain an unfair advantage at trial." The government asserts that failure to preserve the video evidence was a mere "oversight," and that negligence or recklessness is not sufficient to support a finding of bad faith. In the context of the instant case, we disagree.

Contrary to the government's contentions, Agent Alvarado's actions were not merely negligent or reckless, nor was the video destroyed in the normal course of the government's usual procedures. Agent Alvarado testified that she has a professional obligation to collect and preserve both exculpatory and inculpatory evidence. She admitted that she understood that a defendant who is threatened or forced to commit a crime has a possible defense to that crime. Agent Alvarado also testified that she knew the pedestrian line at the Port of Entry was under constant video surveillance and that she had the ability to review and preserve the video recordings. However, despite this knowledge, including her knowledge of the apparent exculpatory value of the evidence, Alvarado made no attempt to view or preserve the Port of Entry video before it was destroyed.

Agent Alvarado authored four reports in connection with this case. Of the four reports, only one, which was prepared shortly before the district court's hearing on Zaragoza's motion to dismiss, included Zaragoza's statements about being coerced into transporting the drugs and trying to attract law enforcement attention while in the pedestrian line. Even more disturbing, Alvarado's probable cause statement

supporting the criminal complaint that was presented to the magistrate judge did not include any reference to Zaragoza's claims of duress. Although Alvarado testified that such reports and affidavits should be complete and accurate, these official documents contained glaring omissions in light of the statements Zaragoza repeatedly made to Alvarado.

The follow-up investigation conducted by Agent Alvarado further indicates that she acted in bad faith in failing to preserve the video footage from the Port of Entry. After questioning Zaragoza, Alvarado confirmed that Karen had indeed crossed the border through the pedestrian line at the San Ysidro, California, Port of Entry with Zaragoza on December 22, 2011. This information, at least in part, corroborated Zaragoza's statements to Alvarado, providing Alvarado with yet another reason to at least view the video evidence to determine if Zaragoza's statements could be corroborated or disproved. In light of the apparent value of the video evidence, which was known to Agent Alvarado, her actions following Zaragoza's interview are sufficient to establish that she made "a conscious effort to suppress exculpatory evidence," thereby acting in bad faith. *Trombetta*, 467 U.S. at 488.

As noted above, in concluding that the government did not act in bad faith, the district court did not address the AUSA's actions, or lack thereof, in light of the December 28, 2011, letter from defense counsel requesting the preservation of video evidence. The parties agree, as do we, that Agent Alvarado should not have been the only relevant actor in the court's bad faith analysis. The government, however, argues that the AUSA's "failure to notify [Homeland Security Investigations] of Zaragoza's request to preserve the video evidence was nothing more than an oversight based on the

fact that the parties were in plea negotiations that led to the negotiated settlement of the case."

We reject this argument that plea negotiations somehow excused the AUSA's lack of action following receipt of the letter. When discovery is requested by the defendant, as was the case here, plea negotiations should be based on full disclosure of the requested evidence. In addition, had the initial plea negotiations been successful, evidence of Zaragoza's duress claim, even if an imperfect defense, would have been relevant as a mitigating factor at sentencing. *See* 18 U.S.C. § 3553(a)(1) ("The court, in determining the particular sentence to be imposed shall consider — the nature and circumstances of the offense . . . ."); *see also* U.S.S.G. § 5K2.12 (sentencing court may depart from Guideline range "[i]f the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense").

Moreover, when the government fails to comply with preservation requests and allows evidence to be destroyed, it likely runs afoul of its discovery disclosure requirements under Fed. R. Crim. P. 16. *See, e.g.*, *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013) (Fed. R. Crim P. 16(a)(1)(E)(i), requiring the government to "disclose any documents or other objects within its possession, custody or control that are 'material to preparing the defense' . . . . is unconditional."). While non-compliance with Rule 16 does not amount to a due process violation absent bad faith, the government's failure to take action in response to defense counsel's letter in the instant case is particularly disturbing. Nevertheless, because Agent Alvarado's actions are sufficient to establish bad faith we need not decide whether that failure would also constitute bad faith or contribute to such a finding.

Because the district court did not find that the government acted in bad faith in failing to preserve the video evidence, it did not address whether "the missing evidence is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Sivilla*, 714 F.3d at 1172 (quoting *Trombetta*, 467 U.S. at 489). The government argues that Zaragoza has not met her burden to show a lack of reasonably available comparable evidence. According to the government, comparable evidence is available in the form of defendant's own testimony concerning her duress claim and cross-examination of "the Customs and Border Patrol officers about her demeanor, whether she attempted to withdraw from the crime, and whether they were aware of her attempts to call their attention to the people who allegedly threatened her." We again disagree.

The government has not suggested any reasonably available evidence that would be comparable to the destroyed video footage of the Port of Entry pedestrian line. The government's argument that in lieu of the destroyed video footage Zaragoza could testify at trial concerning her conduct in the Port of Entry line, runs afoul of Zaragoza's Fifth Amendment right against self-incrimination, by essentially forcing her to testify in her own defense. Notwithstanding the obvious Fifth Amendment implications triggered by the government's argument, Zaragoza's self-serving testimony, especially in light of her substantial cognitive disabilities, would not be comparable to video footage that recorded her actions while in the pedestrian line. Cross examination of the border inspectors regarding Zaragoza's behavior in the pedestrian line would also be incomparable, because neither the primary nor secondary inspectors observed Zaragoza while she waited in line. Consequently, we conclude that

Zaragoza is unable to find comparable evidence to support her duress defense.

## CONCLUSION

For the foregoing reasons, we conclude that the district court committed clear error by finding that the apparent exculpatory value of the Port of Entry pedestrian line video was not known to Agent Alvarado and that the government, therefore, did not act in bad faith in failing to preserve the evidence.  Because we have determined that Agent Alvarado knew of the potential usefulness of the video footage and acted in bad faith by failing to preserve it, Zaragoza's due process rights were violated.  We therefore reverse and remand to the district court with directions to dismiss the indictment.

**REVERSED and REMANDED.**