Filed 2/2/16  P. v. Parks CA2/1
Reposted to provide correct filed date

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES HENRY PARKS,<br><br>    Defendant and Appellant. | B262656<br><br>(Los Angeles County<br>Super. Ct. No. TA133853) |

APPEAL from a judgment of the Superior Court of Los Angeles County, John T. Doyle, Judge.  Affirmed.

Elizabeth K. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Connie H. Kan, Deputy Attorney General, for Plaintiff and Respondent.

_____

James Henry Parks (Parks) appeals from a judgment sentencing him to 11 years in prison for residential burglary (Pen. Code, § 459[1]).  Parks contends that, at a minimum, he should be retried because his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated when the police failed to preserve a surveillance video.  We disagree.  Although the video was "potentially useful" to Parks's defense, we find, pursuant to *Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [109 S.Ct. 333, 102 L.Ed.2d 281] (*Youngblood*), that there was no due process violation because substantial evidence supports the trial court's finding that the police did not act in bad faith.

## BACKGROUND

### A.    *The burglary*

On Sunday, June 1, 2014, Mary Ann Phillips (Phillips), a 68-year-old woman, left her apartment in the Jordan Downs Housing Project (Jordan Downs) in Los Angeles, California.  Phillips had lived in the Jordan Downs since 1984.  Before leaving for church, she locked the door to her apartment and the door to her bedroom where her most valuable possessions were kept; in addition, the bars surrounding her window air conditioning unit were all in place.

When Phillips returned from church she noticed that her front door was standing open and that one of the bars in front of her apartment window had been cut away, the glass pushed in, and the screen had been thrown on the roof.  Phillips also saw two young men running down a walkway away from her apartment.  One of the men was holding a purple pillow case from her bed that appeared to contain things.  Although the men were running away from her, she saw their profiles.  She recognized both men, one of whom was Parks.  Phillips recognized Parks because he was a resident of Jordan Downs; in fact, she had known him since he was a baby and had seen him more than "a thousand times."  Phillips also recognized Parks because he had a limp.  Although Phillips could not recall Parks's name in the immediate aftermath of the burglary, she told the responding officer,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Officer Jason Archie (Archie), that she would remember the name once she "calmed down." A few days after the burglary and after providing Parks's name to the police, she identified Parks in a photographic line-up.

B.     *The surveillance video regarding the burglary*

At the time of the burglary, there were approximately 30 surveillance cameras in the Jordan Downs. As soon as he received notice of Phillips's 911 call, Archie, who was assigned to a specialized unit covering Jordan Downs and several other similar housing projects and who was at his station at the time the call came in, quickly reviewed the live footage from the cameras at Jordan Downs. Not seeing any activity related to Phillips's emergency call, Archie and his partner drove to Jordan Downs.

After interviewing Phillips, Archie returned to the station's "camera room" and searched every camera that he thought might have footage related to the burglary. He viewed footage that had been recorded from 11:00 a.m. to 3:30 p.m. on the day of the incident. He looked for any footage that might show activity that was either "consistent or inconsistent" with Phillips's statements to him. From one camera's recording, he saw "pixelated shadows that were near . . . what would be the northern window where the suspects broke in. And it was behind a rose bush." The video, however, did not reveal anything other than "pixelated shadows." Archie assumed the shadowy figure was human, but he could not tell if there was one or two people, or whether they were male or female, black or white, fat, tall, or small. At the time, Archie did not request that the police retain the videos because, as he later explained, "there was nothing there, and [the police] do [not] save nothing." In response to what Phillips had told him about seeing the suspects run down a walkway and get into a car, Archie also reviewed the footage from the camera that viewed the street. He saw nothing matching her description of two suspects running and then driving away. However, that particular camera did not show the entire street, but just "pieces" of it. Although, at the time, Jordan Downs had more than two dozen surveillance cameras, the coverage of the project was incomplete—that is, there were a lot of "dead spots" that the cameras did not cover and, because the cameras had been there for years, all of the residents "know where the dead spots are."

3

In addition, Officer Darryl Danaher (Danaher) reviewed the relevant video recordings. Danaher's job is twofold: to monitor the housing projects' cameras on a "live" basis; and to search for relevant video after a crime report has been made. During the course of his review, Danaher found nothing that would "either support the complaining witness or disagree with [her]."

In short, neither Archie nor Danaher found anything on the recorded videos that would assist the investigation into the crime. Unless video footage from a camera is "bookmarked" or "saved" within 45 days, the footage is erased when the cameras rerecord over previous video footage. At the time, Archie was unaware of the 45-day rerecording/erasure policy.

Police arrested Parks on June 18, 2014. When the police, pursuant to a warrant, searched Parks's residence, they found none of Phillips's belongings.[2] In addition, although a number of fingerprints were recovered from Phillips's apartment, none matched Parks's fingerprints.

C.      *The trial*

A preliminary hearing was held on July 8, 2014. Phillips was the only witness to testify for the People. At the preliminary hearing, Parks's counsel asked Archie informally for a copy of the surveillance video footage. At that time, Archie advised Parks's counsel that the video was "not of good quality." Archie did not respond immediately to the defense's request for the video, because he did not regard it as an "urgent matter," believing that he could "pull the video" at any time. On July 22, 2014, Parks was arraigned. On that same day, Parks's counsel made a formal discovery request for, inter alia, the video footage. At the time of the defense's formal discovery request more than 45 days had passed since the burglary.

In late August 2014, Archie was subsequently contacted by a detective who asked for a copy of the video footage; it was then that Archie discovered that video had been

---

[2] The burglars stole the following items from Phillips's apartment: her pistol; her husband's shotgun; all her jewelry; her CD and movie collection; the title to her car; and her life savings, which she kept in a Bible.

4

erased/recorded over. In November 2014, Archie made a simulation video, employing another officer to stand by the rose bushes where Archie had seen pixilated shadows; the simulation video was shown to the jury.

On November 25, 2014, before trial, Parks moved to dismiss the case against him due to the destruction of the footage from the surveillance cameras. The court held an evidentiary hearing and heard oral argument on the motion on December 8-9, 2014. On December 9, 2014, the trial court denied the motion without prejudice, finding that the exculpatory value of the original footage would not have been readily apparent and that Parks had failed to establish bad faith on the part of the police. However, the trial court also subsequently ruled that while Archie may not have acted in bad faith, he was negligent and, as a result, the People could not "get a free pass on that." Accordingly, the trial court approved a jury instruction that provided as follows: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] LAPD failed to retain the surveillance video from June 1st that showed shadows outside the window of Ms. Phillips. [¶] The video was destroyed. The defense was never able to view the video. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that destruction of evidence."[3]

Much of the testimony at the trial concerned whether Parks walked with a limp— that is, whether Phillips's identification of Parks as one of the men running from her apartment was credible. For its part, the People supplemented Phillips's testimony with that of two police officers who testified that they each spoke with the athletic director at Parks's high school who told them that the defendant did in fact walk "funny" and that he

---

[3] In the absence of a bad faith finding, the trial court was not required to issue such a jury instruction. (See *People v. Cooper* (1991) 53 Cal.3d 771, 811–812 [absent bad faith, no adverse-inference sanction warranted]; accord, *People v. Zapien* (1993) 4 Cal.4th 929, 965–966 [refusal to adopt adverse inference from negligent destruction of evidence was within court's discretion].)

had a limp. When the athletic director herself testified, her testimony was more equivocal, affirming that while Parks did walk "funny" she thought it might be due to the "baggy pants" he wore to school. The athletic director also testified that Parks was an "all-star" athlete for the school's football and basketball teams. In rebuttal, the People called an administrator from Parks's high school, who testified that he had known Parks since 2009 and recalled Parks having a sports-related injury in the period 2009-2011 that required him to use crutches and which forced him to walk with a limp.

For its part, the defense challenged Phillips's identification of Parks both directly and indirectly. The director of the Jordan Downs Recreation Center and the high school's basketball coach testified that they never saw Parks walk with a limp. An emergency medical physician testified for the defense as an expert witness, opining that although his examination revealed scarring on Parks's left kneecap consistent with orthoscopic surgery, Parks did not demonstrate any "abnormalities in his gait" or otherwise walk with a limp. Additionally, the defense called an expert on eyewitness memory, who testified generally about the fallibility of eyewitness testimony.

On December 16, 2014, after less than a day of deliberation, the jury returned a guilty verdict. On March 11, 2015, Parks moved for a new trial on several grounds, including the police's failure to preserve the surveillance video footage from June 1, 2014. On March 12, 2015, after hearing oral argument, the trial court denied Parks's motion and sentenced Parks. On that same day, Parks filed a timely notice of appeal.

**DISCUSSION**

A.      *Standard of review*

We review the trial court's decision on a *Trombetta*/*Youngblood* motion under the substantial evidence standard. (*People v. Memro* (1995) 11 Cal.4th 786, 831.) "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value" in support of the court's decision. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "'"""If the circumstances reasonably justify the trier of fact's findings, the opinion of the

6

reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.""""" (*Ibid.*)

      B.      *The surveillance video was only "potentially useful" to Parks*

"Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence 'that might be expected to play a significant role in the suspect's defense.'" (*People v. Roybal* (1998) 19 Cal.4th 481, 509.) The threshold inquiry in establishing whether a defendant's due process rights have been violated is to determine whether the destroyed evidence was "'material exculpatory'" evidence or only "'potentially useful'" evidence. (*Illinois v. Fisher* (2004) 540 U.S. 544, 549 [124 S.Ct. 1200, 157 L.Ed.2d 1060].)

If the evidence is materially exculpatory—that is, it has an "exculpatory value that [is] apparent before the evidence was destroyed" (*California v. Trombetta* (1984) 467 U.S. 479, 489 [104 S.Ct. 2528, 81 L.Ed.2d 413]), then the defendant need not show bad faith on the part of the police or prosecution; he or she need only show that the nature of the evidence was such that "the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Ibid.*)

If, however, the evidence was only potentially useful to the defense—that is, "evidentiary material of which no more can be said than that it could have been subjected to tests, the result of which *might* have exonerated the defendant" (*Youngblood*, *supra*, 488 U.S. at p. 57, italics added)—then the defendant would also have to show that the government acted in bad faith in failing to preserve the evidence. (*Illinois v. Fisher*, *supra*, 540 U.S. at p. 549.) As the *Youngblood* court explained, a showing of bad faith for potentially useful evidence is necessary because the "'fundamental fairness'" requirement of the due process clause does not and should not impose on the police "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the

7

police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." (*Youngblood*, at p. 58.)

To establish that the lost or destroyed evidence was "materially exculpatory," a defendant faces a demanding challenge, as illustrated by *U.S. v. Butler* (W.D.Mo., Sept. 29, 2011, No. 09–00235–01–CR–W–DGK) 2011 WL 5387535. In that case, two officers from the Kansas City, Missouri Police Department (KCPD) decided to conduct a pedestrian check on a man who appeared to be frightening a woman. As the patrol car approached the defendant, he ran away and was then pursued by the officers in their patrol car. (*Id*. at p. *1.) That pursuit was recorded by their car's dashboard camera. (*Ibid*.) One year later, the video was destroyed "pursuant to then-KCPD policy inasmuch as 365 days had passed since the video images had been placed on a storage disc and no 'hold slips' for the video had been received by the Patrol Video Unit." (*Id*. at p. *2.) The defendant filed a motion to dismiss arguing that the failure of the officers to preserve the dashboard recording violated his right to due process. (*Ibid*.) The federal district court found that the dashboard recording was merely potentially useful evidence, and not materially exculpatory evidence: "In this case, at best, Butler has only shown that the video from the dashboard camera of the patrol car is potentially useful; Butler has not established that the subject video would be clearly exculpatory. As such, the government's failure to maintain and preserve the video is only a violation of Butler's due process rights if Butler has proven bad faith on the part of the KCPD in destroying the video." (*Ibid*.) In other words, materially exculpatory evidence must be more than merely suggestive of the defendant's innocence. If the lost or destroyed evidence is indeterminate with regard to the defendant's guilt, then it is only potentially useful.

Here, although the video footage was reviewed multiple times and reviewed by different officers prior to being erased/recorded over, no one saw anything that was determinative of Parks's innocence or guilt. Accordingly, because the evidence is uncontradicted that the video was "not of good quality" and its exculpatory (and inculpatory) value was not apparent prior to its destruction, we conclude that the

8

destroyed video footage was, at best, only potentially useful to Parks's defense. As a result, our inquiry turns to whether the police acted in bad faith.

      *C.     There was no bad faith by the police*

In determining whether the police acted in bad faith, our Supreme Court has elected to focus on what the police knew about the evidence: "'The presence or absence of bad faith by the police . . . *must necessarily* turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" (*People v. Frye* (1998) 18 Cal.4th 894, 943, quoting *Youngblood*, *supra*, 488 U.S. at p. 56, fn. *, italics added.)[4]

Taking their cue from *Youngblood*, *supra*, 488 U.S. at p. 58, which held that the failure of police to refrigerate clothing and perform tests on semen samples was "at worst" merely negligent, a number of federal and state courts have held that "'destruction of evidence in accordance with an established procedure precludes a finding of bad faith absent other compelling evidence.'" (*U.S. v. Gomez* (10th Cir. 1999) 191 F.3d 1214, 1219; see *U.S. v. Butler*, *supra*, 2011 WL 5387535 at p. *3; *U.S. v. Deaner* (3rd Cir. 1993) 1 F.3d 192, 202; *U.S. v. Houston* (8th Cir. 2008) 548 F.3d 1151, 1155; *State v. Casselman* (IdahoApp. 2005) 114 P.3d 150, 154; *State v. Schexnayder* (La.App. 5th Cir. 1996) 685 So.2d 357, 366; *Patterson v. State* (Md. 1999) 741 A.2d 1119, 1129; *State v. Hall* (Nev. 1989) 768 P.2d 349, 350; *State v. Wittenbarger* (Wash. 1994) 880 P.2d 517, 522.)

In arguing that bad faith was present here, Parks relies on two cases (*U.S. v. Zaragoza-Moreira* (9th Cir. 2015) 780 F.3d 971 (*Zaragoza-Moreira*); and *People v. Alvarez* (2014) 229 Cal.App.4th 761 (*Alvarez*)), both of which are readily distinguishable.

---

[4] The Ninth Circuit has also held that the bad faith inquiry turns on the government's knowledge, not its intent. (See *U.S. v. Sivilla* (9th Cir. 2013) 714 F.3d 1168, 1172.) Other jurisdictions, however, focus not on the police's knowledge but on the police's wrongful intent in determining bad faith. (See, e.g., *State v. Bousum* (S.D. 2003) 663 N.W.2d 257, 263; *State v. Greenwold* (Wisc.App. 1994) 525 N.W.2d 294, 298.)

In *Zaragoza-Moreira*, *supra*, 780 F.3d 971, the defendant was charged with bringing drugs through a port of entry and she asserted a duress defense. (*Id.* at pp. 974–975.) During her initial interview by a government agent, the defendant asserted that she had not wanted to commit the offense and she reiterated numerous times that she had made herself "'obvious'" while in the pedestrian line at the port of entry because she was trying to get caught. (*Id.* at pp. 975–976.) Although, the defendant made numerous references to her conduct while in line at the port of entry—thereby putting the government agents on notice as to the value of the port of entry video—the government failed to preserve the video, allowing it to be automatically recorded over within 30 to 45 days of the defendant's arrest. (*Id.* at p. 977.) The Ninth Circuit held that the district court correctly found that the video was only potentially useful evidence, not materially exculpatory, but incorrectly found that the Homeland Security agent had not acted in bad faith. (*Id.* at p. 978.) The Ninth Circuit found the agent had made a "'conscious effort to suppress exculpatory evidence,'" because the agent made "no attempt" to preserve or even view the port of entry video before it was destroyed, despite knowing about the defendant's claims regarding her conduct in the entry line and despite knowing that the port of entry was "under constant video surveillance and that [the agent] had the ability to review and preserve the video recordings." (*Id.* at p. 980.) Moreover, three out of four of the agent's reports in connection with the case omitted any reference to the defendant's claims of duress. (*Ibid.*)

Here, in contrast, there was no attempt to conceal potentially exculpatory evidence. The police knew about the cameras, reviewed both live and recorded footage in connection with the instant case, revealed the existence of the video footage to Parks's counsel at the preliminary hearing and, at that same time, described its content and production quality. Archie, due to a lack of technical knowledge and/or training, simply failed to preserve the video, which was erased/recorded over pursuant to standard operating procedure.

In *Alvarez*, *supra*, 229 Cal.App.4th 76, surveillance video, which may have shown that two defendants in a robbery case were not involved with the third defendant, was

10

erased/recorded over before anyone had a chance to review it. The trial court dismissed the charges, finding bad faith on the part of the police, and the Court of Appeal affirmed: "The court determined the [Fullerton Police Department] and the prosecution were well aware of the potential usefulness of the video, and did nothing, despite their knowledge that the [Fullerton Police Department]'s policy at the time was only to preserve video for a short period. If 'the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant' [citation] and fail to preserve it, that shows bad faith. Both [the initial detective], on the night of the incident, and the prosecutor, at the initial hearing, acknowledged the potential usefulness of the video. [¶] . . . [The initial detective] disclaimed all responsibility to follow up on the video, and had no idea who the individual responsible for doing so might be. When taken together with the prosecution's statement at the initial hearing that steps were being taken to preserve the video, this amounted to more than mere negligence." (*Id*. at p. 777.)

In contrast, no one from the police (or the prosecution) ever told Parks or his counsel that the video was potentially useful; in fact, they said just the opposite, because unlike in *Alvarez, supra*, 229 Cal.App.4th 76, the video had been reviewed multiple times and by different officers and found to be of poor quality and indeterminate. Moreover, Archie never denied his responsibility to procure a copy of the video for the defense; he simply did not realize that a copy needed to be made before the automatic rerecording began after 45 days. Accordingly, we hold that the trial court's finding of no bad faith, only negligence, was supported by substantial evidence.

11

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


LUI, J.


12