## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                  Respondent,<br><br>    v.<br><br>RODNEY JOSEPH YEAGER,<br><br>                  Appellant. | No.59378-5-II<br><br><br>UNPUBLISHED OPINION |

MAXA, P.J. – Rodney Yeager appeals his convictions of four counts of felony harassment. After his arrest for an unrelated incident, Yeager was brought to the Cowlitz County jail. Yeager was intoxicated and uncooperative, and officers placed him in a holding cell. Yeager then threatened the jail officers as well as an investigating deputy sheriff. Yeager had no memory of the incident because of his intoxication.

The jail had security cameras in the holding area that recorded video but no audio. However, the jail destroyed the video of the incident after 60 days without producing it to either the State or Yeager. Yeager filed a motion to dismiss all charges under CrR 8.3(b), which the trial court denied. At trial, the jury was instructed on the definition of "threat" based on existing Washington law that subsequently was rendered erroneous by the United States Supreme Court in *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023).

We hold that (1) although the surveillance video was potentially useful to the defense, the trial court did not err in finding that the video was not destroyed in bad faith; and (2) the trial court's harassment jury instructions were rendered erroneous by *Counterman* and the error was not harmless beyond a reasonable doubt.[1]

Accordingly, we reverse Yeager's harassment convictions and remand for a new trial.

FACTS

*Background*

Around 2:00 AM on June 18, 2022, Yeager was brought to the Cowlitz County jail. Officers Andrew Caldwell and Jeff Bergman placed Yeager in a holding cell in the booking area of the jail because he was intoxicated and he had threatened them.

Yeager asked to make a phone call from the holding cell and the officers refused. Yeager then said to Caldwell, "Wait till I find where you live, I'll f***ing shoot you." Report of Proceedings (RP) at 191. Yeager banged on the door inside the holding cell. Yeager later told Bergman, "I'll get some druggies and I'll get some people, we'll go to your house, and then we'll see how tough you really are." RP at 216. Yeager also used his finger to make a slashing motion.

Bergman reported the incident to the sheriff's office. Deputy Kenneth Rago responded to the call. Yeager said to Rago, "F*** you," and "I will beat your ass even with your badge on." RP at 202. Yeager said that he would find Rago and beat him up.

Yeager was charged with four counts of felony harassment.

---

[1] Yeager also argues that the trial court erred in failing to give a missing evidence jury instruction regarding the destroyed security video. Because we are reversing and remanding for a new trial on other grounds, we do not address this argument.

*Security Video*

The jail had three security cameras in the holding area and one camera in the holding cell where Yeager was placed. The cameras recorded video but not audio.

On June 24, 2022, defense counsel filed a notice of appearance and a request for discovery, including a request for "[a]ny video and audio recordings connected with this case." Clerk's Papers (CP) at 28. In October, defense counsel sent an email to Blaine Lux, the operations captain of the Cowlitz County jail, requesting that video of the June 18 incident be preserved. Lux responded that the video had been destroyed.

Yeager filed a motion to dismiss the harassment charges under CrR 8.3(b) based on destruction of the security camera video. The trial court conducted an evidentiary hearing to address the motion.

Lux testified that the jail's normal retention period for video was 60 days. However, if there is an identified incident, the policy was to retain the video until exhaustion of the appeal process. Lux believed that the 60-day retention period applied in this case because the incident involved only verbal statements that the security cameras did not record.

The trial court denied the motion to dismiss. The court entered the following conclusions of law:

1. The security camera video footage was not materially exculpatory evidence. The video footage did not possess an exculpatory value that was apparent before it was destroyed because it did not record sound and thus would not have shown whether the defendant did or did not make the threats alleged.

2. The security camera video footage could have been potentially useful to the defense.

3. Neither the jail nor the prosecutor's office acted in bad faith by failing to preserve the security camera video footage beyond sixty days under the circumstances.

> 4.  Failure to preserve the security camera video footage does not prejudice defendant's right to a fair trial.

CP at 28.

Defense counsel subsequently learned that on June 23, 2022, the prosecutor's office had sent a request to the Sheriff's office for the security video from the booking area. Deputy Rago attempted to comply with this request on August 27 but was told that the video no longer was unavailable. Based on this new evidence, Yeager renewed his motion to dismiss. The trial court stated that the new evidence did not change its prior ruling or its findings and conclusions, and the court denied the renewed motion.

*Jury Trial*

At trial in June 2023, Caldwell, Bergman, and Rago testified to the facts stated above. Caldwell testified that Yeager was placed in a holding cell because he was intoxicated. He testified that, once placed in the holding cell, Yeager became argumentative and demanded phone calls, demanded to be let out of jail, and "would not listen or reason with us at all." RP at 190.

Bergman testified that Yeager was placed in the holding cell because "[h]e was quite obnoxious, didn't want to listen uncooperative." RP at 214. During cross-examination, Bergman agreed that Yeager was intoxicated.

Rago testified that when he was trying to give Yeager information while he was in the holding cell, Yeager yelled at him "I don't understand" several times. RP at 202.

Yeager testified that he had no memory of being arrested, being taken to jail, or threatening Caldwell, Bergman, or Rago. He said he had been blacked-out drunk.

The jury instructions stated that, in order to convict, the jury must find that Yeager knowingly threatened Caldwell, Bergman, and Rago. The jury instructions included the following:

> Instruction No. 7: A person knows or acts knowingly or with knowledge with respect to a fact, circumstance or result when he is aware of that fact, circumstance, or result. It is not necessary that the person know that the fact, circumstance or result is defined by law as being unlawful or an element of a crime.

CP at 84.

> Instruction No. 8: Threat means to communicate, directly or indirectly, the intent to cause bodily injury in the future to the person threatened or to any other person. To be a threat, a statement or act must occur in a context or under such circumstances where a *reasonable person*, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

CP at 85 (emphasis added).

The jury returned guilty verdicts on all four counts. At sentencing, the trial court observed that Yeager's remarks were "just drunkenness." RP at 314.

Yeager appeals his convictions.

## ANALYSIS

### A. DESTRUCTION OF EVIDENCE

Yeager argues that the State violated his right to present a complete defense when it allowed the video of the incident to be destroyed. He argues that the video could have been useful for his defense and that law enforcement acted in bad faith because it knew the video potentially was significant. We disagree.

#### 1. Legal Principles

Under both the United States and Washington Constitutions, due process in criminal prosecutions requires fundamental fairness and a meaningful opportunity to present a complete

5

defense. *State v. Wittenbarger*, 124 Wn.2d 467, 474-75, 880 P.2d 517 (1994). To satisfy due process, the prosecution has a duty to disclose material exculpatory evidence and a related duty to preserve it. *Id*. at 475. The State's failure to preserve evidence that is material and exculpatory violates a defendant's right to due process and requires that the charges against the defendant be dismissed. *Id*.

However, law enforcement does not have " 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " *State v. Armstrong*, 188 Wn.2d 333, 345, 394 P.3d 373 (2017) (quoting *Wittenbarger*, 124 Wn.2d at 475). But they are "required to preserve all potentially material and favorable evidence" in their possession. *Armstrong*, 188 Wn.2d at 345.

"To be material exculpatory evidence, 'the evidence must both possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " *Id*. (quoting *Wittenbarger*, 124 Wn.2d at 475). On the other hand, the failure to preserve evidence that is only potentially useful does not violate due process "unless the suspect can show bad faith by the State." *Armstrong*, 188 Wn.2d at 345.

The presence or absence of bad faith first depends on " 'the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.' " *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (quoting *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993)). Second, the defendant must show "that the missing evidence is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " *Sivilla*, 714 F.3d at 1172 (quoting *California v. Trombetta*, 476 U.S. 479, 489, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)).

"Acting in compliance with its established policy regarding the evidence at issue is determinative of the State's good faith." *Armstrong*, 188 Wn.2d at 345.

Claims that the destruction of evidence denied a defendant due process present a mixed question of fact and law. *State v. Davila*, 184 Wn.2d 55, 74, 357 P.3d 636 (2015). We review the trial court's factual findings for substantial evidence and its legal conclusions de novo. *Id*. at 74-77.

2.    Analysis

The trial court concluded that (1) the video was not materially exculpatory, but (2) the video was potentially useful to the defense. Yeager does not challenge the first conclusion and agrees with the second conclusion. But he does challenge conclusion of law 3: "Neither the jail nor the prosecutor's office acted in bad faith by failing to preserve the security camera video footage beyond sixty days under the circumstances." CP at 28. The question here is whether law enforcement recognized the apparent exculpatory value of the video at the time it was destroyed and therefore acted in bad faith.

The jail had security cameras that recorded video but not audio. Lux testified that he believed that the normal 60-day retention policy applied to this video because the incident involved verbal statements that the security cameras did not record. Yeager cites no evidence that Lux or anyone at the jail acted in bad faith when they made this decision. Indeed, given that the nature of the incident primarily revolved around Yeager's verbal threats toward the officers and not around his body language or any physical altercation, it was reasonable for Lux to believe that the video would not be useful even though it technically recorded an incident at the jail.

Yeager argues that the jail acted in bad faith because they destroyed the security footage that they knew depicted an alleged crime, despite his request to preserve it and in violation of their written policy requiring its preservation. Yeager analogizes this case to *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015). In that case, Zaragoza-Moreira was accused of carrying drugs into the United States from Mexico. *Id*. at 974. After she was arrested, she told a border patrol agent that she had been coerced into transporting the drugs and that she had attempted to attract the attention of authorities by making noises, wiggling around, patting her stomach, and throwing her passport on the ground. *Id*. at 975-76.

Zaragoza-Moreira was charged with importing heroin and methamphetamine into the United States the next day. *Id*. at 976. Her attorney requested "any and all videotapes" be preserved. *Id*. Two months later, her attorney filed a motion to compel discovery referencing the videotape, and the trial court ordered the government to preserve the evidence. *Id*. at 976-77. When the prosecutor requested the video, the United States Customs and Border Protection informed them that the video had been destroyed a month earlier when it was automatically recorded over. *Id*. at 977.

Zaragoza-Moreira moved to dismiss the charges against her, but the trial court denied her motion. *Id*. at 977-78. The court reasoned that the destruction of the video was not in bad faith because its value was not readily apparent to the border patrol agent in charge of the investigation. *Id*. at 978. The Ninth Circuit reversed, explaining that Zaragoza-Moreira had described her actions during her initial interview, so the border patrol agent necessarily was aware that the video footage was potentially useful evidence for her defense. *Id*. at 979-80. The border patrol agent testified that she had overlooked retrieving the footage and that she did not

8

believe Zaragoza-Moreira's duress defense, but her awareness that the footage existed and could support a defense rendered her failure to preserve the video to be in bad faith. *Id*.

*Zaragoza-Moreira* is distinguishable. First, the crux of Zaragoza-Moreira's duress defense was her claim that she wiggled around, patted her stomach, and purposefully dropped her passport to get the attention of law enforcement while she was waiting in line to go through customs. *Id*. at 975-76. Those are all physical actions that the video evidence would have captured. In contrast, the conduct at issue in this case was Yeager's verbal threats toward the officers, which would not have been captured on the video recording. Although Yeager speculates that his movements and facial expressions might have been helpful to his defense, this was not apparent to the jail.

Second, the border patrol agent who failed to preserve video evidence in *Zaragoza-Moreira* knew that the video evidence was important to Zaragoza-Moreira's defense. Therefore, she should have known that the video had potentially exculpatory value. In contrast, in this case Lux reasonably assumed that the security video was not relevant to the incident because it did not actually record Yeager's threats since it did not capture audio. There is no indication that Lux knew or even suspected that Yeager's actions as opposed to his words were important to his defense.

Yeager argues that the fact that the prosecutor requested the jail videos and directed Rago to obtain them shows that the State understood that it was an important piece of evidence. He claims that Rago's failure to preserve or review the video before it was destroyed was bad faith because Rago knew that the officers' reports contained allegations that Yeager made a "slashing" motion and pounded on the door. Yeager asserts that the jail was aware that Yeager's conduct would appear on the video and that it therefore had value to the case. Finally, Yeager argues that

the jail failed to follow its own policy regarding the preservation of video because it was required to preserve the video through the appeal process since an incident had occurred.

But we conclude that Rago's failure to preserve the video was not done in bad faith because, as explained above, the crux of the harassment charges was what Yeager *said* to the officers, and not what he *did*. Yeager's assertion that the jail knew the video was valuable to the case is undermined by Lux's testimony that he did not believe the video constituted an incident because it did not include audio. And Yeager's argument that the police acted in bad faith because it did not follow its own policy is incorrect. Lux reasonably believed that he in fact was following jail policy.

We hold that the trial court did not err in concluding that law enforcement did not act in bad faith when it did not preserve the video recording of the incident at the jail. Accordingly, we reject Yeager's argument.

B.    "TRUE THREAT" JURY INSTRUCTION

Yeager argues that under *Counterman*, 600 U.S. 66, his harassment convictions must be reversed because the jury instruction defining "threat" stated a reasonable person standard rather than a recklessness standard. He argues that the government cannot show this was harmless error beyond a reasonable doubt. The State concedes that the jury instruction was erroneous, but argues that the error was harmless because sufficient evidence supports his conviction under *Counterman*. We agree with Yeager.

1.    Legal Principles

RCW 9A.46.020(1)(a)(i) states that a person is guilty of harassment if they knowingly threaten to cause bodily injury. Because this statute criminalizes pure speech, to avoid violating

the First Amendment Washington courts read RCW 9A.46.020(1)(a)(i) as prohibiting only "true threats." *State v. Allen*, 176 Wn.2d 611, 626, 294 P.3d 679 (2013).

Under Washington law existing at the time of trial, a true threat was a " 'statement made in a context or under such circumstances wherein a *reasonable person* would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life' of another person." *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004) (emphasis added) (internal quotation marks omitted) (quoting *State v. Williams*, 144 Wn.2d 197, 208-09, 26 P.3d 890 (2001)). A true threat is one that arouses fear in the person threatened, and that fear does not depend on the speaker's intent. *Kilburn*, 151 Wn.2d at 43. Therefore, a statement will be a true threat if a "reasonable speaker would foresee that the threat would be considered serious." *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010).

After Yeager was convicted but during this appeal, the United States Supreme Court decided *Counterman*, 600 U.S. 66. The Court held that the First Amendment requires that the true threat determination must include a "subjective mental-state requirement." *Id*. at 75. The State must prove the defendant made the threat at least recklessly. *Id*. at 69, 79. Specifically, "[t]he State must show that the defendant consciously disregarded a substantial risk that [their] communications would be viewed as threatening violence." *Id*. at 69. The defendant must be "aware 'that others could regard [their] statements as' threatening violence and 'deliver[ed] them anyway.' " *Id*. at 79 (quoting *Elonis v. United States*, 575 U.S. 723, 746, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015) (Alito, J., concurring in part and dissenting in part)).

2. Analysis

Yeager argues that jury instruction 8 – which defined a threat – was erroneous under *Counterman*. The State concedes that the jury instruction was erroneous, but argues that the

11

error was harmless. We agree that instruction 8 was erroneous, but we conclude that the error was not harmless beyond a reasonable doubt.

       a.    Erroneous Instruction

The trial court instructed the jury that to be a threat,

> [A] statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

CP at 85.

Although this instruction was correct under the law existing at the time of trial, under *Counterman* the instruction is erroneous. *State v. Calloway*, 31 Wn. App. 2d 405, 421-22, 550 P.3d 77, *review granted*, 3 Wn.3d 1031 (2024). The instruction omitted the constitutional requirement that *Yeager* – not just a reasonable person – " 'consciously disregarded a substantial risk that [their] communications would be viewed as threatening violence.' " *Id*. at 421 (quoting *Counterman*, 600 U.S. at 69).

Accordingly, we agree that jury instruction 8 was erroneous.

       b.    Harmless Error

We review an error in the harassment jury instructions relating to the true threat requirement under a constitutional harmless error standard. *Calloway*, 31 Wn. App. 3d at 424. We presume prejudice, and the State must prove beyond a reasonable doubt that the error was harmless. *Id*. An error is harmless if we are convinced beyond a reasonable doubt that the jury would have reached the same verdict without the error. *Id*.

Omitting the required mens rea from the jury instructions " 'may be harmless when it is clear that the omission did not contribute to the verdict,' for example, when 'uncontroverted evidence supports the omitted element.' " *Id*. (quoting *Schaler*, 169 Wn.2d at 288). However,

"an 'error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds.' " *Calloway*, 31 Wn. App. 2d. at 424 (quoting *Schaler*, 169 Wn.2d at 288).

Here, Caldwell and Bergman testified that Yeager was intoxicated when he made his threats. Yeager testified that he was blacked-out drunk and did not remember making threats to anyone while in jail. The trial court observed at sentencing that Yeager's remarks were "just drunkenness." RP at 314.

The State argues that this case is similar to *Calloway*. In that case, Calloway called and texted the victim nonstop over the course of a day. 31 Wn. App. 2d at 411. Calloway threatened to harm the victim, called her names, and threatened to kill her. *Id.* At one point, Calloway called the victim and said that he was preparing to come to her house to kill her. *Id.* Calloway continued to threaten the victim even after she told him that she had called 911. *Id.* at 411-12.

This court held that the instructional error was harmless beyond a reasonable doubt. *Id.* at 424. The court noted that there was no evidence Calloway was intoxicated or that his state of mind was altered when he made the threats. *Id.* at 25. The court concluded that "no reasonable jury would find that Calloway did not at least consciously disregard a substantial risk that his communications would be viewed as threatening violence." *Id.*

But *Calloway* is distinguishable. There was no evidence that Calloway was intoxicated when he made the threats. *Id.* In contrast, it is undisputed that Yeager was heavily intoxicated when he threatened the officers. And Yeager did not remember making the threats when he woke up in the cell. In other words, is not at all clear that Yeager, in his drunken state, " 'consciously disregarded a substantial risk that [his] communications would be viewed as threatening violence.' " *Calloway*, 31 Wn. App. at 421 (quoting *Counterman*, 600 U.S. at 69).

Accordingly, we hold that the error in jury instruction 8 was not harmless beyond a reasonable doubt.

## CONCLUSION

We reverse Yeager's harassment convictions and remand for a new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

PRICE, J.

CHE, J.