# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>TURNER LEE CALLOWAY,<br><br>Appellant. | No. 57226-5-II<br><br><br><br>PUBLISHED OPINION |

GLASGOW, J.—Turner Calloway was convicted of felony harassment for threatening to kill Aljorie Davis. After Calloway appealed his judgment and sentence, the United States Supreme Court decided *Counterman v. Colorado*,[1] which refined the true threat standard for determining whether a threatening statement lacks the protection of the First Amendment to the United States Constitution.

Calloway argues that *Counterman* rendered Washington's harassment statute facially unconstitutional, that *Counterman* rendered the jury instructions erroneous and the error was not harmless, and that the $500 crime victim penalty assessment should be stricken from his judgment and sentence. Calloway also challenges his sentence in a statement of additional grounds for review (SAG).

---

[1] ___ U.S. ___, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023).

We hold that the harassment statute, RCW 9A.46.020,[2] is not facially unconstitutional. *Counterman* requires a departure from prior case law that placed a First Amendment limitation on the statute, but it does not require us to declare the harassment statute unconstitutional. We further hold that the jury instructions in this case were erroneous because they allowed the jury to convict Calloway without finding that he acted recklessly, as *Counterman* requires. But this error was harmless beyond a reasonable doubt in light of the threatening statements Calloway made and the circumstances under which he made them. We reject Calloway's SAG argument. We affirm Calloway's conviction and sentence, but we remand to the trial court to strike the $500 crime victim penalty assessment.

FACTS

I. BACKGROUND

Calloway and Davis became friends in 2013. In the friendship's earlier years, Calloway and Davis met up often, and Calloway regularly gave Davis rides and took care of her lawn. But in later years, Calloway made insulting statements to Davis, and his behavior strained the friendship.

On October 31, 2021, Calloway called and texted Davis "nonstop." Verbatim Rep. of Proc. (VRP) (July 5, 2022) at 114. After Calloway repeatedly threatened to kill Davis, she called 911. Law enforcement arrested Calloway when he drove by Davis's house. The State charged Calloway with felony harassment. The State also charged Calloway with stalking, but the jury acquitted him of that charge.

---

[2] Although Calloway was convicted of violating an older version of the statute, we cite the current version throughout this opinion because the relevant language has not changed.

## II. TRIAL

A.     <u>State Witnesses</u>

Davis testified about the events leading up to Calloway's arrest. She said that in mid-October 2021, she and Calloway met up at a bar, and he began behaving strangely: "He started yelling in the bar, saying things about me, and then he just started telling people we were together." VRP (July 5, 2022) at 111. Davis denied that they were in a relationship and asked Calloway to take her home.

After Calloway drove Davis home, Davis stopped contacting Calloway, but Calloway "just started calling out of the blue." *Id.* A couple of days later, Calloway asked Davis if she wanted to drive to Seattle and see the city lights. Davis said she did not want to do that because it was an activity for couples. Davis testified that Calloway then "snapped:" "He went into calling me names, and he . . . just started threatening[] and started talking crazy." VRP (July 5, 2022) at 112. Calloway repeatedly called and texted Davis, and Davis called back to ask him to stop. On October 31, Calloway made "nonstop, back-to-back phone calls" starting at 6:51 a.m. VRP (July 5, 2022) at 114. Calloway threatened to harm Davis and called her derogatory names. Davis responded by calling him back, and at one point, she left a message on his phone that included profanity and accused Calloway of being jealous. She said, "You don't scare me and you don't worry me not one bit. Your bitch ass ain't gonna never step up to me." Ex. 4. She also referred to things Calloway had been "saying for nine years" because he couldn't have her. *Id.* Davis testified that she left the message because she was angry and wanted to scare Calloway off.

Calloway began threatening to kill Davis around 5:00 p.m. on October 31. Davis listed the following statements that Calloway made:

> Bitch, you going to die today; bitch[,] you ain't shit; bitch[,] you going [to] the devil the day that you die; you going to hell today, bitch; today is your day; you're going to die today, bitch[,] and hang up, call back; I'm on my way to kill you, bitch; you're going to die today, bitch.

VRP (July 5, 2022) at 120. Later in the evening, Davis had a friend pretend to be her boyfriend over the phone. Davis said she thought a "deep voice" would make Calloway "back off." VRP (July 5, 2022) at 115. In a three-way call with Calloway, the friend told Calloway to leave Davis alone, and Calloway started threatening the friend. Calloway then said he was preparing to come to Davis's house and kill her. Davis hung up and called 911 because she felt that the situation was "getting serious." VRP (July 5, 2022) at 116.

When Brent Johnson, a deputy sheriff, arrived at Davis's house, Davis's cellphone rang repeatedly and she answered it a couple of times. Eventually, Davis handed Johnson the phone, and Johnson identified himself as law enforcement. Davis testified that Calloway told Johnson he was going to "come shoot" and that everyone at her house was going to die. VRP (July 5, 2022) at 121. Johnson testified that Calloway told him he was outside and "was going to kill" Davis. VRP (July 6, 2022) at 157. Johnson called for backup.

Riley Jorgensen, a second deputy sheriff, then arrived at Davis's home. Shortly afterward, Calloway drove past Davis's house. Calloway did not stop, but Davis recognized him and told the officers. A third deputy sheriff stopped Calloway about a mile from the house.

Jorgensen testified about his conversation with Calloway after they stopped him. According to Jorgensen, Calloway said Davis started harassing him after she found out he was in a relationship with someone else. Calloway said he had been drinking at a bar with friends when he "got into [it]" with Davis over the phone that day and drove to Davis's house so he could fight her boyfriend. VRP (July 6, 2022) at 177.

B.     Defense Witnesses

Calloway also testified about the events leading up to his arrest. He testified that he never asked Davis to see the Seattle city lights with him. He said that about a week before the incident, he and Davis went to a couple of bars, and he lost his glasses. On the morning of October 31, he texted Davis to ask about the glasses, and Davis called back and called him derogatory names. Calloway and Davis then called each other throughout the day. Calloway said he was "responding," so he "had to have [made] half of those calls." VRP (July 6, 2022) at 196. He said he did not make any threats that day.

Calloway testified that during one of his calls with Davis, while he was at a bar with his wife, a man threatened to kill him. He said he did not call 911 because of a prior negative experience with law enforcement. After the call, Calloway's wife was afraid, so Calloway took her to her parents' house. Calloway then drove to Davis's house because he wanted to know why Davis's boyfriend wanted to kill him. He said he wanted to see if they "could just make peace" because he had not done anything wrong. VRP (July 6, 2022) at 210.

Calloway said that when he spoke with Johnson on the phone, Johnson "didn't have a chance to identify himself." VRP (July 6, 2022) at 198. Calloway thought he was speaking with Davis's boyfriend, so he immediately "went into [his] rant." *Id.* Calloway denied making any threats.

In describing his arrest, Calloway said he initially told Jorgensen that Davis was harassing him. He said Jorgensen asked him if he drove to Davis's house to fight her boyfriend, and he told Jorgensen "what he wanted to hear" because he was "intimidated." VRP (July 6, 2022) at 200.

5

C.    Closing Arguments and Jury Instructions

During closing arguments, the State argued, "It's not a jest or idle talk to say, bitch, you're going to die. You're done." VRP (July 6, 2022) at 224. The State added that a reasonable person in Calloway's position would have understood "what those words meant[] and the impact they would have on Ms. Davis." *Id.*

The defense argued that the State did not prove beyond a reasonable doubt that Calloway made any threats at all, pointing out that the only recording from the incident showed Davis insulting Calloway. The defense did not argue that Calloway's capacity was diminished by alcohol or mental illness or that Calloway's threats were merely hyperbolic.

The trial court instructed jurors that, to convict Calloway, they had to find that Calloway "knowingly threatened to kill . . . Davis immediately or in the future." Clerk's Papers (CP) at 22. They also had to find that Calloway's words or conduct placed Davis "in reasonable fear that the threat to kill would be carried out." *Id.* The trial court further instructed jurors that, to be a true threat, a statement must occur under "circumstances where a reasonable person, in the position of the speaker, would foresee that the statement . . . would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk." CP at 20.

The jury found Calloway guilty of felony harassment. The jury acquitted Calloway of stalking.

### III. SENTENCING

The trial court sentenced Calloway to 10 months in jail. The trial court found that Calloway was indigent under RCW 10.101.010(3)(a)-(d) but imposed a $500 crime victim penalty

6

assessment. In calculating Calloway's offender score, the trial court counted Calloway's prior Mississippi convictions of burglary and child molestation.

Calloway appeals his judgment and sentence.

ANALYSIS

I. HARASSMENT STATUTE

Calloway argues that we must vacate his conviction because under *Counterman*, the harassment statute violates the First Amendment to the United States Constitution by punishing threats "using a negligence standard." Br. of Appellant at 11 (boldface omitted). He contends that the Washington Supreme Court has interpreted the statute to require a showing that the defendant knowingly threatened to cause bodily injury but only negligently placed the threatened person in reasonable fear that the threat would be carried out. Calloway notes that "the relevant statutory language was enacted nearly four decades ago" and the legislature has not amended the statute in response to the Washington Supreme Court's interpretation. Br. of Appellant at 21. Citing *State v. Blake*,[3] Calloway contends that because of "this history of legislative acquiescence, it would be improper to now reinterpret the statute to avoid the constitutional problem." Br. of Appellant at 22. We disagree.

A.    Statutory Application in Light of Recent United States Supreme Court Decisions

"Our purpose in interpreting a statute is to determine and carry out the intent of the legislature." *State v. Eaton*, 168 Wn.2d 476, 480, 229 P.3d 704 (2010). "We must construe statutes consistent with their underlying purposes while avoiding constitutional deficiencies." *Id.* We presume "a statute is constitutional, and the party challenging it bears the burden of proving

_____

[3] 197 Wn.2d 170, 481 P.3d 521 (2021).

otherwise beyond a reasonable doubt." *Didlake v. State*, 186 Wn. App. 417, 422-23, 345 P.3d 43 (2015).

Where a party contends a statute is unconstitutional on its face, that party will prevail only if there is no set of circumstances in which a constitutional application of the statute is possible. *State v. Fraser*, 199 Wn.2d 465, 486, 509 P.3d 282 (2022). "The remedy for facial unconstitutionality 'is to render the statute totally inoperative.'" *Id.* (quoting *City of Redmond v. Moore*, 151 Wn.2d 664, 669, 91 P.3d 875 (2004)).

In general, we are bound to follow Washington Supreme Court precedent. *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 590, 146 P.3d 423 (2006). Still, the "United States Supreme Court is the final authority on the federal constitution." *State v. Radcliffe*, 139 Wn. App. 214, 224, 159 P.3d 486 (2007), *aff'd*, 164 Wn.2d 900, 194 P.3d 250 (2008). In a matter of federal constitutional law, a clear directive from the United States Supreme Court controls where the Washington Supreme Court has not yet addressed that recent directive's effect. *See id.* at 223-24. And if Washington Supreme Court case law is plainly at odds with a more recent United States Supreme Court interpretation of the federal constitution, we do not presume that the Washington Supreme Court will reject that recent interpretation in favor of its own prior interpretation. *See id.* at 224.

B.     *Counterman*'s Requirements for Prosecutions Based on Threats

The First Amendment does not protect true threats of violence. *Counterman*, 143 S. Ct. at 2113. "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* at 2114 (alteration in original) (quoting *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003)).

8

Whether a statement is a true threat depends in part on what the statement conveys to the listener rather than on the speaker's mental state. *Id.* In *Counterman*, the United States Supreme Court held that the First Amendment also demands "a subjective mental-state requirement." *Id.* The Court held that where the State prosecutes a defendant for making a threat, it must prove the defendant made the threat at least recklessly: "The State must show that the defendant consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." *Id.* at 2111-12. In other words, the State must demonstrate that the defendant was "aware 'that others could regard [the] statements as' threatening violence and '[delivered] them anyway.'" *Id.* at 2117 (quoting *Elonis v. United States*, 575 U.S. 723, 746, 135 S. Ct. 2001, 192 L. Ed. 2d 1 (2015) (Alito, J., concurring in part and dissenting in part)).

In announcing the recklessness requirement, the Supreme Court noted that reckless conduct is less morally culpable than knowing conduct, explaining that a person knowingly threatens when they know "to a practical certainty that others will take [their] words as threats." *Id.* The Court also explained that reckless conduct is more morally culpable than negligent conduct. *Id.* at 2117 n.5.

C.    Washington's Harassment Statute

Under RCW 9A.46.020(1), a person is guilty of harassment if, without "lawful authority," they knowingly threaten to "cause bodily injury immediately or in the future to the person threatened or to any other person," and they place "the person threatened in reasonable fear that the threat will be carried out." RCW 9A.46.020(1)(a)(i), (b). Harassment becomes a class C felony if it involves "threatening to kill the person threatened or any other person." RCW 9A.46.020(2)(b)(ii).

9

The statute's plain language delineates a knowledge element: "'the defendant must subjectively know'" that they are communicating a threat and know that the communication "'is a threat of intent to cause bodily injury to the person threatened or to another person.'" *State v. Trey M.*, 186 Wn.2d 884, 895, 383 P.3d 474 (2016) (internal quotation marks omitted) (quoting *State v. Kilburn*, 151 Wn.2d 36, 48, 84 P.3d 1215 (2004)). Thus, for example, a person who writes a threat in a journal unaware that it will ever be read or heard by another does not knowingly threaten. *Id.*

The Washington Supreme Court has imposed a constitutional limitation, explaining that a person may only be convicted of violating RCW 9A.46.020 if they made a true threat. *Kilburn*, 151 Wn.2d at 41. The court has defined a true threat as "'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of'" another person. *Trey M.*, 186 Wn.2d at 894 (alteration in original) (internal quotation marks omitted) (quoting *State v. Williams*, 144 Wn.2d 197, 207-08, 26 P.3d 890 (2001)).

A "'true threat is a serious threat, not one said in jest, idle talk, or political argument.'" *Id.* (quoting *Kilburn*, 151 Wn.2d at 43). Whether "'a statement is a true threat or a joke is determined in light of the entire context, and the relevant question is whether a reasonable person in the defendant's place would foresee that in context the listener would interpret the statement as a serious threat or a joke.'" *Id.* (quoting *Kilburn*, 151 Wn.2d at 46). This definition of a true threat "requires the defendant to have some mens rea as to the result of the hearer's fear: simple negligence." *State v. Schaler*, 169 Wn.2d 274, 287, 236 P.3d 858 (2010).

As described in *Schaler*, the mental state of simple negligence requires objective consideration of the reasonable person. *Id. Counterman* defines negligence as an "objective

standard" at the bottom of the "*mens rea* hierarchy:" "A person acts negligently if [they are] not but should be aware of a substantial risk . . . that others will understand [their] words as threats." *Counterman*, 143 S. Ct. at 2117 n.5. This definition is somewhat similar to Washington's definition of criminal negligence, the lowest level of culpability in the statute designating the hierarchy of mental states. RCW 9A.08.010(1)(d). A defendant acts with criminal negligence when they fail "to be aware of a substantial risk that a wrongful act may occur and [their] failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." *Id.* All these forms of negligence involve less culpability than the recklessness that *Counterman* now requires. After *Counterman*, the defendant must have *subjective* awareness of the "substantial risk that [the] communications would be viewed as threatening violence." 143 S. Ct. at 2112.

D.      Constitutionality of Washington's Harassment Statute under *Counterman*

We hold that RCW 9A.46.020 remains constitutional on its face because we can recognize that Washington must now comply with *Counterman*'s articulation of what amounts to a true threat without undermining the statute.

RCW 9A.46.020(1)(a)(i) requires the State to prove that the defendant subjectively knew they were communicating a threat to cause bodily injury. The knowledge element goes to whether the defendant knew they were *conveying* a threat, as opposed to keeping their words private, and whether they knew the communication they were imparting was a threat to harm or kill the person threatened or another person. *Trey M.*, 186 Wn.2d at 895. Thus, if a person mutters a threat without awareness that someone heard it, their conduct does not satisfy the statutory knowledge

requirement. *Id.* This statutory knowledge requirement is different from the additional mens rea analysis the true threat case law requires.

*Counterman* contradicts the true threat limitation the Washington Supreme Court has placed on the statute, but this incompatibility does not require us to declare the statute unconstitutional. Calloway cites *Schaler* for the proposition that RCW 9A.46.020 only requires a showing that the defendant negligently placed the victim in reasonable fear that the threat would be carried out. But the portion of the *Schaler* opinion discussing negligence addresses the definition of a true threat under relevant case law, not the language of RCW 9A.46.020. *Schaler*, 169 Wn.2d at 287. And in holding that RCW 9A.46.020 criminalized only true threats, the court was ensuring compliance with the First Amendment, following the principle that courts apply statutes in ways that preserve their constitutionality whenever possible. *Id.* at 283-84.

*Counterman* constitutes a clear directive from the United States Supreme Court on a matter of federal constitutional law, and the Washington Supreme Court has not yet addressed *Counterman*'s effect. Washington's pre-*Counterman* true threat limitation on RCW 9A.46.020 contravenes the First Amendment because it does not go far enough. *Counterman* now requires proof "that the *defendant*"—not just a reasonable person in their position—"consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." 143 S. Ct. at 2112 (emphasis added).

Given that there is no direct conflict between the statutory language and the *Counterman* articulation of what amounts to a true threat, we need not declare the harassment statute unconstitutional. We need only hold, consistent with *Counterman*, that the State must prove the defendant was at least "aware 'that others could regard [the] statements as' threatening violence

12

and '[delivered] them anyway.'" *Id.* at 2117 (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)).

Although this holding contradicts the Washington Supreme Court's pre-*Counterman* cases, we do not presume the Washington Supreme Court will now reject a United States Supreme Court holding on the federal constitution. *See Radcliffe*, 139 Wn. App. at 223-24. We are permitted to apply the recently adopted United States Supreme Court rule.

Calloway relies on *Blake* to argue that legislative acquiescence to the Washington Supreme Court's limitation on the statute forecloses our application of *Counterman*, but *Blake* is distinguishable. Noting that courts ordinarily construe statutes to avoid unconstitutionality, the *Blake* court declined to apply this principle and held that a statute violated due process because it made drug possession a strict liability crime. *Blake*, 197 Wn.2d at 188, 195. The *Blake* court reasoned that it had previously declined to read a mental state element into the statute and the legislature had not added such an element in response: "Because of the clarity of our prior decisions . . . and the legislature's lengthy acquiescence, it is impossible to avoid the constitutional problem now." *Id.* at 192.

But here, we do not read a new element into RCW 9A.46.020. Rather, we apply the most recent binding articulation of a court-imposed limitation on the statute—one the legislature has not undone. In 2001, the Washington Supreme Court first limited the statute's proscription on speech to true threats. *Williams*, 144 Wn.2d at 209. The legislature then amended the statute in 2003 and 2011, and neither amendment suggested legislative intent to change or get rid of the true threat

13

limitation. *See* LAWS OF 2003, ch. 53, § 69; LAWS OF 2011, ch. 64, § 1.[4] The United States Supreme Court recently announced a binding definition of true threat that Washington courts must follow.

In sum, we presume statutes are constitutional, and RCW 9A.46.020's plain language allows us to apply it in a way that complies with the First Amendment. Because the United States Supreme Court has intervened, we are permitted to depart from prior Washington Supreme Court holdings and import the United States Supreme Court's definition of a true threat. Therefore, Calloway has not met his burden of proving that the statute is facially unconstitutional as a result of *Counterman*.

## II. JURY INSTRUCTIONS

The trial court instructed the jury that to be a true threat, a statement "must occur in a context or under such circumstances where *a reasonable person, in the position of the speaker*, would foresee that the statement . . . would be interpreted as a serious expression of intention to carry out the threat." CP at 20 (emphasis added). But *Counterman* requires proof "that the defendant"—not just a reasonable person in their position—"consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." 143 S. Ct. at 2112. In other words, *Counterman* requires proof that the defendant was actually "aware 'that others could regard [the] statements as' threatening violence and '[delivered] them anyway.'" *Id.* at 2117 (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)). The State

---

[4] We note that none of the amendments the legislature has made since Calloway's crime in 2021 suggest legislative intent to change or get rid of the true threat limitation. *See* LAWS OF 2023, ch. 102, § 16; LAWS OF 2024, ch. 292, § 1.

appears to concede that the true threat jury instruction in this case was therefore erroneous in light of *Counterman*.[5]

Calloway argues that we must reverse his harassment conviction because neither the to convict instruction nor the instruction defining a true threat required "the jury to find that any threat by [him] met the constitutional true threat recklessness standard." Br. of Appellant at 24. Calloway further argues that this error was not harmless beyond a reasonable doubt because evidence of a true threat was not uncontroverted and the State emphasized the negligence standard during closing argument.

The State responds that Calloway failed to challenge the relevant jury instruction below, so "Calloway's instructional challenges are barred by RAP 2.5(a)(3)." Br. of Resp't at 1. The State focuses its RAP 2.5 argument on lack of actual prejudice. The State also contends that any instructional error was harmless because Calloway denied that he made any threats, rather than arguing he made them "under circumstances in which they should not have been taken seriously." *Id.* at 40.

We hold that RAP 2.5(a) does not prevent us from reaching Calloway's claim. While the jury instructions in his case were erroneous, the error was harmless beyond a reasonable doubt.

---

[5] This instruction was based on a Washington pattern jury instruction that has since been revised to incorporate the rule *Counterman* announced. In defining a true "threat," the revised instruction states that "the speaker must know of and disregard a substantial risk that the statement or act would be interpreted" as "a serious expression of intention to carry out the threat." WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.24 (updated Jan. 2024), https://govt.westlaw.com/wcrji/Document/Ief9980dde10d11daade1ae871d9b2cbe?viewType=Fu llText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc. Default).

A.    Review for the First Time on Appeal

"The general rule in Washington is that a party's failure to raise an issue at trial waives the issue on appeal unless the party can show the presence of a 'manifest error affecting a constitutional right'" under RAP 2.5(a)(3). *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011) (internal quotation marks omitted) (quoting *State v. Kirwin*, 165 Wn.2d 818, 823, 203 P.3d 1044 (2009)). The purpose of this rule is to ensure "the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *Id.* at 304-05. But "in a narrow class of cases," such as cases involving intervening pronouncements from the United States Supreme Court, "insistence on issue preservation would be counterproductive to the goal of judicial efficiency," as it would "reward the criminal defendant bringing a meritless motion" but punish "the criminal defendant who, in reliance on . . . binding precedent, declined to bring the meritless motion." *Id.* at 305.

Accordingly, RAP 2.5(a) does not preclude review of an issue not raised in the trial court when "(1) a court issues a new controlling constitutional interpretation material to the defendant's case, (2) that interpretation overrules an existing controlling interpretation, (3) the new interpretation applies retroactively to the defendant, and (4) the defendant's trial was completed prior to the new interpretation." *Id.*

Here, the first two requirements are discussed in depth above. *Counterman* applies to Calloway because his appeal is not yet final. *See State v. Harris*, 154 Wn. App. 87, 92, 224 P.3d 830 (2010). And Calloway's trial ended before *Counterman* was decided. We therefore reach the merits of Calloway's claim that the jury instructions in his case were erroneous.

B. Constitutional Harmless Error

*Counterman* requires proof that the defendant was actually "aware 'that others could regard [the] statements as' threatening violence and '[delivered] them anyway.'" 143 S. Ct. at 2117 (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)). The omission of the constitutionally required mens rea from the jury instructions in the true threat context is analogous to the omission of an element of the crime from the instructions. *Schaler*, 169 Wn.2d at 288. Such an omission is thus subject to constitutional harmless error review. *Id.* Prejudice is presumed, and the State must prove that the error was harmless beyond a reasonable doubt. *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013). "An error is harmless . . . if the appellate court is assured beyond a reasonable doubt that the jury would have reached the same verdict without the error." *State v. Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019).

An omission of the required mens rea from the jury instructions "may be harmless when it is clear that the omission did not contribute to the verdict," for example, when "uncontroverted evidence" supports the omitted element. *Schaler*, 169 Wn.2d at 288. Conversely, an "error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds." *Id.*

We acknowledge that the evidence of Calloway's state of mind is not entirely uncontroverted. The jury could have drawn an inference from his day-long argument with Davis that he was being hyperbolic. And during closing, the State emphasized the objective standard, arguing that a reasonable person in Calloway's position would have understood the impact their words would have on Davis.

Nonetheless, given the severity of Calloway's threats to both Davis and law enforcement and the jury's clear disbelief of Calloway's denial that he made any threats at all, we hold that the error was harmless beyond a reasonable doubt. Davis testified that Calloway threatened her for an entire day and that the threats escalated in seriousness. When Calloway told Davis he would kill her, his words were anything but equivocal:

> Bitch, you going to die today; bitch[,] you ain't shit; bitch[,] you going [to] the devil the day that you die; you going to hell today, bitch; today is your day; you're going to die today, bitch[,] and hang up, call back; I'm on my way to kill you, bitch; you're going to die today, bitch.

VRP (July 5, 2022) at 120. Neither Calloway nor any other witness testified that these statements were hyperbolic, that Calloway had a longstanding pattern of saying similar things without meaning them, or that intoxication or symptoms of a mental illness affected Calloway's state of mind on the day of the incident. In fact, Calloway testified that he made no threats, an assertion the jury did not find credible.

Moreover, Davis testified that after Calloway found out she had called the police in response to his threatening phone calls, Calloway threatened to kill both her and Johnson, and then Calloway drove to her house. Johnson testified that during the call, Calloway said he was going to kill Davis. Davis's and Johnson's testimony strongly supports the inference that Calloway knew Davis took his homicide threats seriously enough to call 911 and continued making the threats anyway.

Given the words Calloway repeatedly used and the circumstances under which he used them, no reasonable jury would find that Calloway did not at least consciously disregard a substantial risk that his communications would be viewed as threatening violence. The instructional error was thus harmless beyond a reasonable doubt.

18

### III. CRIME VICTIM PENALTY ASSESSMENT

Calloway argues that we should remand for the trial court to strike the $500 crime victim penalty assessment. The State does not respond. We agree with Calloway.

Trial courts may no longer impose the crime victim penalty assessment on indigent defendants. RCW 7.68.035(4). The trial court found Calloway to be indigent under RCW 10.101.010(3) and the State does not contest that finding. We have concluded that the new statute regarding the crime victim penalty assessment applies in all cases that were not yet final when the new statute was adopted. *State v. Eyer*, No. 58055-1-II, slip op. at 7 (Wash. Ct. App. Mar. 26, 2024).[6] Therefore, we remand for the trial court to strike the crime victim penalty assessment.

### IV. STATEMENT OF ADDITIONAL GROUNDS

In his SAG, Calloway argues for the first time on appeal that the trial court erred when it used his prior convictions from Mississippi to calculate his offender score because the convictions were not validated or certified. We disagree.

"The use of a prior conviction as a basis for sentencing under the Sentencing Reform Act . . . is constitutionally permissible if the State proves the existence of the prior conviction by a preponderance of the evidence." *State v. Winings*, 126 Wn. App. 75, 91-92, 107 P.3d 141 (2005). While "the best evidence of a prior conviction is a certified copy of the judgment, the State 'may introduce other comparable documents of record or transcripts of prior proceedings to establish criminal history.'" *Id.* at 92-93 (emphasis omitted) (quoting *State v. Ford*, 137 Wn.2d 472, 480, 973 P.2d 452 (1999)).

---

[6] https://www.courts.wa.gov/opinions/pdf/D2%2058055-1-II%20Unpublished%20Opinion.pdf.

19

Here, to prove that Calloway was convicted of burglary and child molestation in Mississippi, the State provided the Mississippi indictment charging him with these offenses, minutes from the Mississippi proceeding where Calloway pleaded guilty to the offenses, and a certified Washington judgment and sentence listing the offenses in Calloway's conviction history. In addition, our record includes Calloway's signed and certified stipulations that his criminal history, including the Mississippi convictions, is correct. In combination, these documents reliably establish Calloway's foreign conviction history.

The trial court did not err when it calculated Calloway's offender score using his Mississippi convictions for burglary and child molestation.

CONCLUSION

We affirm Calloway's judgment and sentence but we remand to the trial court to strike the $500 crime victim penalty assessment.

GLASGOW, J.

We concur:

MAXA, J.

VELJACIC, A.C.J.