# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57963-4-II |
| Respondent, | |
| v. | |
| SHAWN DOMINIQUE FRANCIS, | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, J. – Shawn Francis appeals his attempted second degree assault and felony harassment convictions, both with deadly weapon enhancements, and his sentence. The convictions were based on a physical altercation between Francis and Joshua Williams during which Francis was holding a knife.

We hold that (1) the prosecutor did not engage in misconduct by arguing that Francis changed his testimony based on research of the law regarding the charged offenses; (2) the evidence was sufficient to convict Francis of attempted second degree assault and the deadly weapon sentencing enhancements; (3) Washington's harassment statute is not unconstitutional despite the United States Supreme Court's decision in *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023); (4) the jury instructions for harassment were erroneous under *Counterman*, but the error was harmless; (5) the convictions for second degree assault and harassment did not violate double jeopardy; (6) the trial court did not err regarding Francis's request for a mental health sentencing alternative; (7) the crime victim penalty assessment (VPA) should be stricken from the judgment and sentence; and (8) we either decline to consider or reject Francis's statement of additional grounds (SAG) claims.

Accordingly, we affirm Francis's convictions, but we remand for the trial court to strike the VPA from the judgment and sentence.

FACTS

*Background*

On April 13, 2022, Francis was involved in an altercation with Williams near an ARCO station in Poulsbo. Williams claimed that Francis rushed out of the woods toward him while threatening to kill him and then physically attacking him. Francis claimed that he approached Williams to see what the problem was, carrying a knife in his hand, and Williams attacked him.

The State charged Francis with second degree assault while armed with a deadly weapon and felony harassment while armed with a deadly weapon.

*Francis's Statements to Police*

Body camera footage from Aulbree Buonvino, the arresting officer on the night of the incident, recorded conversations between Buonvino and Francis. During Buonvino's first interaction with Francis, she asked both Francis and Williams how they knew each other. They both responded, "We don't." Rep. of Proc. (RP) at 704. Buonvino pulled Francis aside and he stated, "I don't have nothing to say. It's all done. It's done and over with. We were horseplaying." RP at 704. He then repeatedly told Buonvino that there was no problem and that there was nothing to investigate because it was over.

After Buonvino arrested Francis and gave him the *Miranda* warnings, Francis gave a second statement describing in detail what had happened. Francis stated that he came down the hill toward the store when he saw Williams and a woman looking toward him and laughing loud. Francis asked them what they were laughing at. Williams jumped up and said, "What's up? What do you gonna do?" RP at 711. Francis then pulled a knife out and approached Williams.

2

Francis stated that after they exchanged words, Williams hit him in the head. After they both fell to the ground, Francis tried to avoid stabbing Williams and eventually tossed the knife away.

Buonvino asked Francis if he knew Williams, to which he responded he did not. But then Francis expanded, stating that he had seen Williams at the ARCO store once before. When Buonvino asked Francis if they had beef between each other, Francis responded that they did not. But Francis later stated that Williams had kept staring at him. Francis denied exchanging words with Williams at that time. Francis also stated that he was only there for 10 minutes, and "I just came to see if the lady over there was all right." RP at 723.

Buonvino stated that it sounded like Francis "came up kind of all hot and heavy with your knife out." RP at 724. Francis denied that, stating instead that Williams was in his path to the store and he just approached him with his knife out to "diffuse the situation." RP at 724. Francis denied that he told Williams "I'm going to f***ing kill you." RP at 725. Instead, he stated that Williams threatened to kill him.

At trial, the trial court admitted as an exhibit the video from Buonvino's body camera. The State played the video for the jury.

*Williams's Testimony*

At trial, Williams testified that on the night of his altercation with Francis, he and Destiny Crow, an employee at ARCO, were sitting outside the store. They were talking, with his back toward the woods, when Williams heard a man, later identified as Francis, yelling. He heard Francis say from up the hill, "F*** you, motherf***er. I'll f***ing kill you." RP at 595. Williams said that he had never seen Francis before this altercation.

Williams stated that he was not very concerned at first because he knew that a lot of homeless people stayed in the area. But when he heard Francis coming through the woods

toward him and continuing to yell profanities, Williams became concerned for his safety. He testified that he thought Francis could have a gun, because when someone says they are going to kill you, one can assume the person has a gun. Williams feared that Francis could kill him.

Williams testified that at this point, Crow, who could see Francis approaching, was scared and she immediately called the police. Williams stood up and walked toward the path in the woods because he was instinctually putting distance between Francis and Crow.

Francis approached Williams quickly, with his chest out and his chin up. Williams first assumed that they would have a conversation but then Francis immediately swung at him and missed. Francis was repeating over and over, "F*** you, mother***er. I'll kill you." RP at 601.

After Francis swung and missed, Williams testified that he immediately punched Francis on the chin. Francis turned around and bent over and Williams turned to walk back toward where he was smoking. Francis then jumped on his back, tackling him to the ground. Williams stated that they rolled on top of one another a few times until he ended up on top of Francis. Williams punched Francis a few more time until Francis said he was done. Then Williams stood up and walked away to where he previously was sitting.

Williams testified that during the physical altercation, he did not notice that Francis was holding a knife. Crow told him that there was knife after he walked away from Francis. Williams was extremely upset thinking about the fact that he could have almost died or gotten seriously injured. Crow told Williams that while he and Francis were rolling around, Francis dropped the knife and Crow kicked it out of his reach. The knife ended up in the dirt.

Although he did not hear any threats during the fight, Williams testified that Crow told him afterward that Francis was threatening to kill him throughout the altercation. Williams stated that he felt scared when he heard about these threats.

*Crow's Testimony*

Crow testified that just before the physical altercation between Francis and Williams, she was sitting outside the store with Williams. They were laughing and joking around about their day when she heard someone yell from the wooded area, later identified as Francis, "What the f*** you laughing at." RP at 658. Crow stated that she did not hear any threats but that Francis just kept repeating what they were laughing at as he came closer to them.

Crow testified that Francis came down the path very quickly and angrily and attacked Williams. Francis jumped on Williams and hit him. And when Francis was on Williams's back, Francis said, "I'm going to kill you." RP at 662. Williams defended himself and punched Francis a few times. Crow stated that when Williams was on the ground, she saw Francis pull out a knife and he again said, "I'm going to f***ing kill you." RP at 663. She repeatedly yelled that there was a knife. When Francis dropped the knife, Crow kicked it to the side.

Crow later stated that when Francis threatened to kill Williams, it sounded like Francis was saying it with conviction.

During cross-examination, Crow testified that she did not see the knife actually come out of Francis's pocket, but she saw it in his hand. Crow stated that when Francis was holding the knife, he was saying, "I'm going to kill you." RP at 683. So she thought Francis was trying to use the knife to stab Williams even though she did not actually see this happen.

On redirect-examination, Crow stated that when Francis was holding the knife, it looked like he took a swing with the knife. But something blocked Francis's arm and the knife flew out of his hand.

*Francis's Testimony*

On direct examination, Francis testified that a few days before the altercation he was checking on an elderly woman who lived in a tent in the woods above the ARCO station. The woman was acting odd and strange. She stated that she got something from Williams, who was sitting outside of the ARCO. Francis stated that he approached Williams, asking if he gave the woman anything. Williams responded, "What the f*** are you talking about? . . . Get the f*** away from me, man." RP at 786. Francis apologized and walked away.

As Francis was walking away, Williams said, "[W]hy don't you guys just beat it?" RP at 787. Francis asked what he meant. Williams stated that they should take their tent and go somewhere else. Francis told Williams that he did not live there, and told him to have a nice day as he left.

Francis testified that on the night of the incident, he was walking up the trail to the wooded hillside above the ARCO when he saw Williams and a woman sitting and talking. Francis stated that Williams was looking at him very intensely and kept looking up at him in an aggressive manner. Williams and the woman would look at him and start laughing. Francis testified that he then made his way down the trail to figure out what the issue was. He stated that he intended to have a conversation with Williams, not to fight him.

As Francis was coming down the trial, he said to Williams, "Hey, man, what's your f***ing problem?" RP at 793. Williams postured up like he wanted to fight. Francis stated that he held a pocketknife in his hand, and that he told Williams he had a knife but he was not trying

6

to fight him. Francis testified that he then told Williams that if Williams was trying to fight, then he would assume that Williams was trying to kill him.

After Williams and Francis exchanged words, Francis testified that he walked back up the trail to try and go around the other side of the ARCO. But once Francis realized there was a fence, he turned around and walked back down the trail toward Williams. When Williams saw Francis, he got up and walked over to where the trail ended.

When he came off the trail, Francis stated that he said to Williams something like, "Dude, what the f***'s your problem, man?" RP at 796. Francis testified that both him and Williams were "amped up," but that he wanted to have a discussion with Williams about how Williams was treating him. RP at 796-97.

Williams stepped toward Francis and Francis stepped back. Francis stated that at that point Williams hit him in the head. While trying to protect himself, he stumbled backward and put the arm holding the knife behind him. Williams continued to punch him, and Francis tried to tell Williams that he had a knife. But Francis stated that he never intended to use the knife; he just wanted Williams to back down. Francis then forced Williams to the ground and Francis threw the knife behind him to get it out of the way of the fight.

After the fight, Francis walked back up the path to where his friend was. After he got his bearings, Francis testified that he came back down the path to go inside the ARCO store and check to see if he was bleeding. He ran into Williams again and they exchanged some words, but Francis eventually went inside the store. When he exited, he testified that he saw the police and spoke with an officer. The officer asked Francis what happened and he told her that "it was done and over with." RP at 813. Francis testified that he was uncomfortable being there because although Williams had just beaten him up, he did not want Williams to go to jail.

During cross-examination, the prosecutor emphasized multiple differences between Francis's statements to the police and his trial testimony.

On recross-examination, the prosecutor asked Francis whether he reviewed the elements of what the State had to prove to prepare for his testimony. Defense counsel objected on the basis of relevance, but the trial court overruled the objection. The prosecutor then had the following colloquy with Francis:

[Francis]: Yes, I've looked at the law, according to the charges.

[Prosecutor]: Right. You know what I have to prove, correct? You've researched that?

[Francis]: To some extent, yeah.

[Prosecutor]: Okay. And you've now changed and you can describe it as change of detail, you've now changed your account of what happened that night after researching the elements of what I have to prove in this case, correct?

[Francis]: Absolutely not.
. . . .

[Prosecutor]: Okay. So one difference between what you told Officer Buonvino on the night of the incident and what you've told the jury in your testimony today, is in the intervening period, you've been able to research what it is that I have to prove. That's a difference, correct?

[Francis]: I mean, I've asked my attorney, but like I'm not – I'm still not entirely sure what exactly you have to establish as to oppose what you don't.

*Jury Instructions*

When discussing jury instructions, the trial court asked whether there was any argument about a self-defense instruction. Defense counsel responded, "No, Your Honor. It's a general denial that . . . [i]n essence, [the State] can't meet the elements under this fact pattern." RP at 890.

The trial court instructed the jury on second degree assault. Instruction 5 stated, "A person commits the crime of assault in the second degree when he or she assaults another with a deadly weapon." Clerk's Papers (CP) at 40. Instruction 6 stated that an assault for the purpose of second degree assault "is an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted." CP at 41. Instruction 8 stated, "Deadly weapon means any weapon, device, instrument, substance, or article, which under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." CP at 43. Instruction 12 stated that a person commits attempted second degree assault "when, with intent to commit assault in the second degree, he or she does any act that is a substantial step toward the commission of assault in the second degree." CP at 47.

The trial court also instructed the jury on the crime of felony harassment. Instruction 21 stated that a person commits harassment when:

> [H]e or she, without lawful authority, knowingly threatens to cause bodily injury immediately or in the future to another person and when he or she by words or conduct places the person threatened in reasonable fear that the threat will be carried out and the threat to cause bodily harm consists of a threat to kill the threatened person or another person.

CP at 56. Instruction 23 stated,

> To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

CP at 58. And the court instructed that in order to convict Francis of harassment, the jury must find beyond a reasonable doubt that (1) Francis knowingly threatened to kill Williams

9

immediately or in the future, (2) Francis's words or conduct placed Williams in reasonable fear that the threat to kill would be carried out, and (3) Francis acted without lawful authority.

*Closing Argument*

During closing argument, the prosecutor stated that Francis had interacted with Williams prior to the incident and that the interaction "didn't come until about the third version of what [Francis] explained," which "kind of candidly leaked out at that point." RP at 968. The prosecutor explained that Francis had three different stories separated by time, with the second and third stories separated by research.

When describing the difference between Francis's first and second story, the prosecutor stated that although Francis had time to reflect on what to say, he did not have the research like he had between the second story in the police car and the third story on the witness stand. The prosecutor then told the jury that he was going to focus on Francis's three changing stories and the legal research that intervened between Francis's second story and his testimony in court. And that Francis's stories did not make sense because they were not credible. The prosecutor further stated, "So revisionist history and favorable fiction, time, research, and goal, the time between the defendant's account, the research that he ultimately does between the second and third." RP at 985.

The prosecutor continued, stating that Francis testified about trying to retreat from the encounter with Williams only after time and research. And the prosecutor again stated that it was after time and research that Francis told a story presenting himself as diplomatically engaging with Williams, as compared to his previous story stating that Williams was staring at him the day before. The prosecutor argued that Francis gave a detailed explanation suggesting self-defense "only after a lot of time and research." RP at 988.

When discussing Francis's relationship with Williams and whether Francis previously knew him, the prosecutor stated that one must consider time, research, and goals. Because in Francis's second story, he stated that he did not know Williams, but then Francis further explained that he had seen Williams once before and that Williams was staring at him. And Francis stated in his second story that he had not exchanged words with Williams at that point. But during his testimony, Francis explained how he had approached Williams and asked him whether he gave his friend drugs. The prosecutor argued that this fundamentally different story unlocked the case because Francis had time and research to create an explanation that casted him in a positive light.

The prosecutor also discussed the attempted second degree assault charge. The prosecutor stated,

> Assault is intent to create in another apprehension and fear of bodily injury, even though the actor – so this is the knife wielder here – didn't actually inten[d] to afflict bodily injury.
> . . . .
>
> I wanted him to see the knife. I wanted him to be afraid of the knife. And [Francis] says, "But I didn't really intend to hit him with a knife. I didn't really intend to sting him with a knife," right?
>
> So an intent to create in another apprehension and fear: Don't you come near me. I'll interpret an assault as a threat upon my life. I've got a knife, right? Intent to create apprehension and fear of bodily injury because what's going to happen if you approach a knife man who's wielding a knife and telling you, I got a knife. And if you assault me, I'm going to interpret that as a threat on my life. And then I get to respond in kind, right? Put [Williams] in apprehension and fear.
> . . . .
>
> So [Francis] wanted him to fear injury with a deadly weapon, and then he – and you can fill in the blank here in terms of dynamic, continuing course of conduct when it happened. He swung it; he displayed it; he threatened him with it.
>
> All of that conduct that you've heard about in the course of the evidence of how this plays out, right, shows that [Francis] really wanted to put [Williams] in apprehension and fear of being hurt with that knife, that deadly weapon in the

11

context of this crime. He showed he really wanted to. It wasn't a joke, it wasn't ambiguous.

. . . .

Now, you put that context in the, "I've got a knife. Don't come near me. I'll interpret anything you do as a threat, you know, an attempt to kill me," when you've got the knife, that's not jest; that's not joke; that's not ambiguous. That's real life. That's mortal combat. That's how people get cut and die.

RP at 1040-43.

The prosecutor then discussed the felony harassment charge. He stated,

Felony Harassment: Knowingly threatens to cause bodily injury immediately or in the future, and that threat is a threat to kill. Mr. Williams's testimony: "Many, angry voice from the woods, 'I'm going to f***ing kill you.' " And this is from the dark, wooded hill that you see the silhouette and the picture where the light doesn't reach. I asked him, you know, at this point, kind of thinking about it in terms of a disembodied voice, you know, "Were you afraid at that time that he was going to follow through with the threat?" "When did you start fearing that it was going to be carried out?" When he heard – after he heard that angry voice threatening to kill him and starts tromping down the woods. And put this is common sense and experience. . . . And you hear this person rumbling, advancing out of the wood line. And when he rushed forward from the dark to attack, that's when he thought that the threat would be carried out.

RP at 1043-44. The prosecutor also discussed the death threat that Crow heard Francis say to Williams right before Francis swung the knife at Williams.

During rebuttal argument, the prosecutor stated that Francis was not a credible witness. And the prosecutor once again argued that Francis had time and research between his stories.

The prosecutor further discussed attempted second degree assault:

So now we're going to Attempted Assault in the Second Degree. And the point that I wanted to make here, when you're considering the difference between this and the crime of displaying that [defense counsel] conceded to [i]n argument, is apprehension and fear of bodily injury. In the context of what happened here, I submit, it is very difficult to describe what [Francis] did in any way other than placing [Williams] in apprehension and fear that he wanted to do it.

RP at 1086.

And the prosecutor further discussed felony harassment:

> This crime is committed in the original sense when you've got the threat to kill from the wood line that initially didn't concern him until he heard the tromping down at the woods. And the angry man with the angry voice came rushing out of the wood line, and he thought the threat was going to be followed through upon.

RP at 1092-93.

*Verdict and Sentence*

The jury found Francis guilty of attempted second degree assault and felony harassment, both with deadly weapon sentencing enhancements.

At the sentencing hearing, defense counsel requested a sentence at the low end of the sentencing range. Defense counsel also asked the trial court, "Mr. Francis has mentioned to me, I guess a few days ago and again today, can it basically the Court grant me a behavioral health court?" RP at 1151-52. The court responded, "I can't do this at this point." RP at 1152.

Three days later, Francis filed a pro se motion requesting a mental health sentencing alternative pursuant to RCW 9.94A.695. The trial court did not rule on the motion.

The trial court determined that Francis was indigent. But the court ordered Francis to pay a $500 VPA.

Francis appeals his convictions and sentence.

## ANALYSIS

A. PROSECUTORIAL MISCONDUCT

Francis argues that the prosecutor engaged in misconduct when during cross-examination the prosecutor asked him whether he researched the law before testifying and then argued during closing argument that Francis conformed his testimony based on his research. Francis claims that these statements constituted unconstitutional tailoring. We disagree.

1.    Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of all the circumstances of the trial. *State v. Zamora*, 199 Wn.2d 698, 708, 512 P.3d 512 (2022). This court's analysis considers "the context of the case, the arguments as a whole, the evidence presented, and the jury instructions." *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021). To show prejudice, the defendant is required to show a substantial likelihood that the misconduct affected the jury verdict. *Id.*

When the defendant fails to object at trial, a heightened standard of review requires the defendant to show that the conduct was " 'so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.' " *Zamora*, 199 Wn.2d at 709 (quoting *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). "In other words, the defendant who did not object must show the improper conduct resulted in incurable prejudice." *Zamora*, 199 Wn.2d at 709. If a defendant fails to make this showing, the prosecutorial misconduct claim is waived. *Slater*, 197 Wn.2d at 681.

2.    Tailoring Argument

Francis argues that the prosecutor's cross-examination questions and closing argument constituted unconstitutional tailoring and therefore was misconduct. We disagree.[1]

A prosecutor's claim of "tailoring" refers to an argument that a defendant has changed their testimony to conform to the evidence presented at trial. *State v. Carte*, 27 Wn. App. 2d 861, 871, 534 P.3d 378 (2023), *review denied*, 2 Wn.3d 1017, 542 P.3d 569 (2024). "Specific"

---

[1] Initially, the State argues that Francis did not preserve his prosecutorial misconduct claim for appeal because at the trial court Francis did not object based on improper tailoring. Because we hold that the prosecutor's comments were not improper, we do not address this argument.

tailoring arguments are based on the defendant's actual testimony. *Id.* "Generic" tailoring arguments are based only on the defendant's presence at trial without reference to specific testimony. *Id.*

Tailoring arguments potentially are problematic because under article I, section 22 of the Washington Constitution a defendant has "the right to appear and defend in person" and "meet the witnesses against him face to face." The Sixth Amendment to the United States Constitution has similar provisions. Noting that a defendant was able to hear all the other testimony before testifying penalizes the defendant for exercising the constitutional right to be present and confront witnesses.

Here, the prosecutor suggested on cross-examination and in closing argument that Francis tailored his testimony to conform to the research he had performed regarding the law. These were tailoring questions and arguments. But they were not *unconstitutional* tailoring claims. Tailoring claims potentially are improper only when the prosecutor argues that the defendant has changed their testimony *to conform to the evidence presented at trial*. *State v. Carte*, 27 Wn. App. 2d at 871. Only when this occurs is the right to appear at trial implicated.

Here, the prosecutor did not question Francis about changing his testimony based on the evidence presented at trial. Instead, he referred to legal research that occurred before the trial. Therefore, this cross-examination and argument did not interfere with the constitutional right to attend trial and did not constitute improper tailoring.

The prosecutor's cross-examination represented classic impeachment based on changes between what Francis told the police and his trial testimony. The prosecutor's closing argument emphasized those changes. There was nothing improper about the prosecutor's conduct.

Accordingly, we hold that Francis's prosecutorial misconduct claim fails.

15

B.    SUFFICIENCY OF EVIDENCE

Francis argues that the evidence was insufficient to convict him of attempted second degree assault (attempted assault with a deadly weapon) or the deadly weapon sentencing enhancements. We disagree.

1.    Standard of Review

The test for determining the sufficiency of evidence is whether any rational trier of fact could find the elements of the charged crime beyond a reasonable doubt after viewing the evidence in a light most favorable to the State. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). We resolve all reasonable inferences based on the evidence in favor of the State and interpret inferences most strongly against the defendant. *Id.*

2.    Attempted Second Degree Assault

a.    Legal Principles

Under RCW 9A.36.021(1)(c), an individual commits second degree assault by assaulting another with a deadly weapon under circumstances not amounting to first degree assault. A deadly weapon means a weapon that "under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6).

"A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). A substantial step is " 'conduct strongly corroborative of the actor's criminal purpose.' " *State v. White*, 150 Wn. App. 337, 343, 207 P.3d 1278 (2009) (quoting *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 539, 167 P.3d 1106 (2007)).

b.    Analysis

Francis argues that the State failed to prove that he took a substantial step towards intending to cause apprehension or fear with a deadly weapon and that he attempted to use, or threatened to use, the knife in a way readily capable of causing death.

But Francis testified that he told Williams that he had a knife and that if Williams tried to fight him, then he would assume that Williams was trying to kill him.  Buonvino's body camera footage also showed Francis stating that he pulled a knife out and approached Williams.

Viewing the evidence in the light most favorable to the State, Francis intended to cause Williams apprehension or fear with his knife by approaching Williams with his knife out and telling Williams that he had a knife.  In addition, Francis attempted to use or threatened to use his knife in a way readily capable of causing death.  By having his knife out and telling Williams that he had a knife and he would assume that Williams was trying to kill him if he fought him, he essentially was threatening to use his knife on Williams.

Therefore, we hold that the evidence was sufficient to support Francis's conviction of attempted second degree assault.

3.    Deadly Weapon Sentencing Enhancements

a.    Legal Principles

Under RCW 9.94A.533(4), the trial court must add time to a sentence if the defendant is found to have been armed with a deadly weapon at the time the offense was committed.  RCW 9.94A.825 states, "For purposes of this section, a deadly weapon is an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death."

To establish that the defendant was armed for purposes of the sentencing enhancement, the State must prove "(1) that a [deadly weapon] was easily accessible and readily available for offensive or defensive purposes during the commission of the crime and (2) that a nexus exists among the defendant, the weapon, and the crime." *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 826, 425 P.3d 807 (2018).

Regarding the first requirement, the presence, close proximity, or constructive possession of a weapon found at a crime scene alone is not enough to establish that the defendant was armed in this context. *Id.* The weapon must be easily accessible and readily available at the time of the crime. *Id.*

Regarding the second requirement, this court looks to the nature of the crime, the type of weapon, and the context in which it was found to determine if there was a nexus between the defendant, the weapon, and the crime. *Id.* at 827.

b. Analysis

Francis argues that there was insufficient evidence to prove a nexus between the charged offenses and his knife. He claims that the mere presence of the knife did not establish a nexus.

Here, Williams testified that Francis threatened to kill him. And Francis admitted to having a knife out when approaching Williams and warning Williams that he had a knife. Francis was still holding onto the knife when Williams hit him and they began fighting. There is no question that the knife was "easily accessible and readily available for offensive or defensive purposes" during the commission of the attempted second degree assault and harassment crimes. *See Sassen Van Elsloo*, 191 Wn.2d at 826.

Further, Francis testified that he told Williams that he had a knife and that if Williams tried to fight him, then he would assume that Williams was trying to kill him. Francis stated that

18

he pulled a knife out and approached Williams to diffuse the situation. Because the charged crimes here are attempted second degree assault and harassment, the jury could draw an inference of a connection between the knife and the crimes.

Therefore, we hold that the evidence was sufficient to support the jury's verdict that Francis was armed with a deadly weapon at the time of his offenses of attempted second degree assault and harassment.

C.      HARASSMENT CONVICTION

Francis argues that his harassment conviction must be reversed under *Counterman* because (1) Washington's harassment statute, RCW 9A.46.020, is unconstitutional; and (2) the harassment jury instructions were erroneous. We conclude that RCW 9A.46.020 is not unconstitutional. We also conclude that the harassment jury instructions were erroneous, but the error was harmless.

1.      Constitutionality of RCW 9A.46.020

Under RCW 9A.46.020(1)(a)(i), a person is guilty of harassment if they knowingly threaten to cause bodily injury. The knowledge element requires the defendant to know they were conveying a threat and to know that the communication was a threat to harm or kill the threatened person or another person. *State v. Calloway*, ___ Wn. App. 2d ___, 550 P.3d 77, 85 (2024).

The true threat case law now requires an additional mens rea analysis than the statutory knowledge requirement. *Id.* After the trial took place in this case, the United States Supreme Court decided *Counterman*, 600 U.S. 66. *Counterman* now requires "that the defendant consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." *Id.* at 69.

19

This court held in *Calloway* that there was "no direct conflict between the statutory language and the *Counterman* articulation of what amounts to a true threat." *Calloway*, 550 P.3d at 86[. And instead of declaring the harassment statute unconstitutional, "[w]e need only hold . . . that the State must prove the defendant was at least "aware 'that others could regard [the] statements as' threatening violence and '[delivered] them anyway.' " *Id.* (quoting *Counterman*, 600 U.S. at 79). Therefore, consistent with *Calloway*, we hold that that RCW 9A.46.020 is not unconstitutional.

### 2. Harassment Jury Instructions

#### a. Preservation of Error

Initially, the State argues that Francis failed to preserve this issue for appeal by not objecting in the trial court and that this issue is not a manifest constitutional error under RAP 2.5(a)(3). However,

> RAP 2.5(a) does not preclude review of an issue not raised in the trial court when "(1) a court issues a new controlling constitutional interpretation material to the defendant's case, (2) that interpretation overrules an existing controlling interpretation, (3) the new interpretation applies retroactively to the defendant, and (4) the defendant's trial was completed prior to the new interpretation."

*Calloway*, 550 P.3d at 88 (quoting *State v. Robinson*, 171 Wn.2d 292, 305, 253 P.3d 84 (2011)).

Here, the decision in *Counterman* applies to the first two requirements. And *Counterman* applies to Francis because his appeal is not yet final and Francis's trial ended before *Counterman* was decided. *Calloway*, 550 P.3d at 88. Therefore, we address Francis's claim that the jury instructions were erroneous.

b.   Analysis

The trial court instructed the jury that to be a threat, "a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk." CP at 58. Although this true threat instruction was correct under the existing law, after *Counterman* the instruction was erroneous. *Calloway*, 550 P.3d at 87. The instruction omitted the constitutionally required mens rea that Francis "was actually 'aware "that others could regard [the] statements as" threatening violence and "[delivered] them anyway." ' " *Id.* (quoting *Counterman*, 600 U.S. at 79).

c.   Harmless Error

We review an error in the harassment jury instructions relating to the true threat requirement under a constitutional harmless error standard. *Calloway*, 550 P.3d at 88. We presume prejudice and the State must prove beyond a reasonable doubt that the error was harmless. *Id.* An error is harmless if the jury would have reached the same verdict without the error. *Id.*

Omitting the required mens rea from the jury instructions " 'may be harmless when it is clear that the omission did not contribute to the verdict.' " *Id.* (quoting *State v. Schaler*, 169 Wn.2d 274, 288, 236 P.3d 858 (2010)). If uncontroverted evidence supports the omitted element, then the error is harmless. *Calloway*, 550 P.3d at 88. However, "an 'error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds.' " *Id.* (quoting *Schaler*, 169 Wn.2d at 288).

Here, Williams testified that Francis yelled at him from the woods, threatening to kill him and that he believed that Francis could kill him. And the statements were not ambiguous.

Williams stated that Francis yelled "F*** you, motherf***er. I'll f***ing kill you," RP at 595, and that after Francis attacked he was repeating over and over, "F*** you, mother***er. I'll kill you." RP at 601. And Crow testified that Francis threatened to kill Williams while he was on Williams's back.

Francis told a different story. But neither Francis nor any other witnesses testified that Francis's statements were hyperbolic, that Francis had a longstanding pattern of saying similar things without meaning them, or that intoxication or symptoms of a mental illness affected Francis's state of mind on the day of the incident. *See Calloway*, 550 P.3d at 89. Francis denied making any threats, but the jury did not find this assertion credible because they found him guilty of harassment.

Given the repeated threats to kill while approaching and then fighting with Williams while holding a knife, no reasonable jury would find that Francis did not at least consciously disregard a substantial risk that his communications would be viewed as threatening violence. Therefore, we hold that the instructional error was harmless beyond a reasonable doubt.

D.    DOUBLE JEOPARDY

Francis argues that his convictions for both attempted second degree assault and harassment violate double jeopardy. We disagree.

1.    Legal Principles

A defendant is protected against multiple punishments for the same offense under the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution. Therefore, a defendant cannot be convicted twice for the same offense. *In re Pers. Restraint of Knight*, 196 Wn.2d 330, 336, 473 P.3d 663 (2020). We review double jeopardy

claims de novo. *Id.* And a defendant may raise a double jeopardy claim for the first time on appeal. *State v. Sanford*, 15 Wn. App. 2d 748, 752, 477 P.3d 72 (2020).

The double jeopardy analysis begins with whether the legislature authorized multiple punishments for both crimes. *Knight*, 196 Wn.2d at 336. Next, we use the *Blockburger*[2] same evidence test to determine whether each offense "*requires a proof of a fact* which the other does not.' " *Id.* (quoting *State v. Freeman*, 153 Wn.2d 765, 772, 108 P.3d 753 (2005)). The rule also asks whether the offenses are the same in law: whether the offenses have no different elements. *State v. Bell*, 26 Wn. App. 2d 821, 839, 529 P.3d 448 (2023).

Finally, we may apply the merger doctrine. *Knight*, 196 Wn.2d at 337. " 'Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime.' " *Id.* (quoting *Freeman*, 153 Wn.2d at 771).

2.    Analysis

Here, the statutes governing second degree assault and harassment do not expressly authorize separate punishments for the same conduct. *State v. Mandanas*, 163 Wn. App. 712, 718, 262 P.3d 522 (2011). Therefore, we apply the same evidence test. *Knight*, 196 Wn.2d at 336.

Attempted second degree assault and harassment do not constitute the same offenses in law. As charged, the State had to prove that Francis assaulted Williams with a deadly weapon. Harassment did not require the use of a deadly weapon. And threats to kill are not sufficient to prove second degree assault. *See Mandanas*, 163 Wn. App. at 719-20. Therefore, the issue is whether the two offenses were based on the same facts. *Knight*, 196 Wn.2d at 336.

---

[2] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 396 (1932).

Francis argues that the offenses were the same in fact because during closing argument the prosecutor relied on the same conduct to prove both second degree assault and harassment. But the conduct proving harassment was separate and apart from the conduct constituting attempted second degree assault.

To prove attempted second degree assault, the prosecutor focused solely on Francis's display of the knife. The prosecutor emphasized that Francis used the knife to create apprehension and fear in Williams. This argument was consistent with the jury instructions, which required the State to prove that Francis attempted to assault Williams with a deadly weapon. The prosecutor did not mention any of the threats in his discussion of attempted second degree assault.

To prove harassment, the prosecutor relied on the moment when Francis threatened to kill Williams and began approaching Williams from the woods. The prosecutor emphasized that Williams began to fear that the threat would be carried out when he heard Francis tromping through the woods and then rushing from the woods to attack him. The prosecutor did not mention the threats Francis yelled while he and Williams were fighting.

Therefore, we reject Francis's argument that the prosecutor relied on the same conduct to prove both second degree assault and harassment. The prosecutor never argued that Francis's threats constituted attempted second degree assault.

Francis also argues that double jeopardy should apply because the same facts necessary to prove harassment also were necessary to prove attempted second degree assault. Francis claims that Williams did not begin to fear that Francis's threats would be carried out until Francis physically attacked him. But that was not Williams's testimony. He testified that he feared somebody could kill him "when I could hear him coming through the woods and he continued to

yell the profanities, and I could hear him coming closer and closer." RP at 596. We reject this argument.

Further, the merger doctrine does not apply here. As stated above, evidence that Francis threatened to kill Williams was necessary to prove the harassment charge, but it was not necessary to prove the attempted second degree assault charge. So proof of harassment does not elevate the attempted assault charge to a higher degree. *See Mandanas*, 163 Wn. App. at 721.

Therefore, we hold that Francis's convictions for both attempted second degree assault and harassment do not violate double jeopardy.

E.     MENTAL HEALTH SENTENCING ALTERNATIVE

Francis argues that the trial court erred in failing to consider his request for a mental health sentencing alternative. We disagree.

Under RCW 9.94A.695(1), a defendant is eligible for a mental health sentencing alternative if:

> (a) The defendant is convicted of a felony that is not a serious violent offense or sex offense;
>
> (b) The defendant is diagnosed with a serious mental illness recognized by the diagnostic manual in use by mental health professionals at the time of sentencing;
>
> (c) The defendant and the community would benefit from supervision and treatment, as determined by the judge; and
>
> (d) The defendant is willing to participate in the sentencing alternative.

Any party or the trial court may make a motion for a sentence under this statute. RCW 9.94A.695(2).

Every defendant is entitled to ask the trial court to consider an exceptional sentence below the standard range and to have the exceptional sentence actually considered. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). "[W]here a defendant has requested a

sentencing alternative authorized by statute, the categorical refusal to consider the sentence, or the refusal to consider it for a class of offenders, is effectively a failure to exercise discretion and is subject to reversal." *Id.*

Here, Francis did not make a proper motion for a mental health sentencing alternative. Although defense counsel requested the court to sentence Francis in the behavioral health court, this was a quick statement with no supporting eligibility information required under RCW 9.94A.695(1). And Francis submitted a pro se motion requesting the sentencing alternative, but it was not filed with the court until after the trial court sentenced Francis.

Therefore, we hold that the trial court did not err in failing to consider Francis's request for a mental health sentencing alternative.

F.     CRIME VICTIM PENALTY ASSESSMENT

Francis argues, and the State concedes, that the $500 VPA should be stricken from his judgment and sentence. We agree.

Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3). *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). For purposes of RCW 10.01.160(3), a defendant is indigent if they meet the criteria in RCW 10.101.010(3). Although this amendment took effect after Francis's sentencing, it applies to cases pending on appeal. *Ellis*, 27 Wn. App. 2d at 16.

The trial court determined that Francis was indigent. Therefore, on remand the $500 VPA must be stricken from the judgment and sentence.

G.     SAG CLAIMS

In his SAG, Francis asserts multiple claims. We either decline to consider the claims or conclude that the claims have no merit.

1. Insufficient Evidence

    a. Attempted Second Degree Assault/Sentencing Enhancements

Francis argues that there was insufficient evidence to support his attempted second degree assault with a deadly weapon conviction and the sentencing enhancements. However, we conclude above that the evidence was sufficient to support the conviction and enhancements. Therefore, we decline to address this SAG claim.

    b. Felony Harassment

Francis argues that there was insufficient evidence to support his felony harassment conviction because the State failed to prove that Williams suffered a reasonable fear that Francis was going to carry out his threat of killing him. But Williams testified that when he heard Francis yell from the woods, "F*** you, mother***er. I'll kill you," RP at 595-97, and then heard him coming through the woods yelling profanities, he feared that Francis would kill him. Williams's testimony provided sufficient evidence that he reasonably feared Francis was going to kill him and for the jury to find Francis guilty of harassment. Therefore, we reject this SAG claim.

2. Prosecutorial Misconduct

Francis argues that the prosecutor engaged in misconduct throughout trial and during closing argument by (1) misrepresenting witness testimony, (2) improperly commenting on witness credibility, and (3) shifting the burden of proof. We either reject or conclude that Francis waived these claims.

    a. Misrepresenting Witness testimony

Francis asserts that the prosecutor misrepresented witness testimony when he argued that (1) Williams suffered from tunnel vision, (2) Francis swung a knife at Williams and Williams

blocked the swing, (3) Crow saw Francis attempt to stab Williams, and (4) instructed the jury to switch out the phrase "stab you" with "kill [you]."

It is improper for the prosecutor to misstate the evidence presented at trial and thereby mislead the jury. *State v. Meza*, 26 Wn. App. 2d 604, 619, 529 P.3d 398 (2023). And a prosecutor engages in misconduct when he or she encourages the jury to consider evidence that is outside of the record. *State v. Teas*, 10 Wn. App. 2d 111, 128, 447 P.3d 606 (2019). However, the prosecutor has wide latitude to assert reasonable inferences from the evidence. *Slater*, 197 Wn.2d at 680.

First, although Williams testified that he did not suffer tunnel vision regarding when he first walked over to the woods, the prosecutor argued that Williams suffered tunnel vision when he was actively engaged in the physical altercation with Francis. Therefore, the prosecutor did not misstate the evidence.

Second, Crow testified that when Francis was holding the knife, it looked like he took a swing with the knife, but something blocked his arm causing the knife to fly out of his hand. The prosecutor argued that although Crow did not know what blocked the knife, because Francis and Williams were fighting, it was likely Williams that blocked the knife. This was not improper because the prosecutor has wide latitude to assert reasonable inferences from the evidence. *Slater*, 197 Wn.2d at 680.

Third, Crow testified that she thought Francis was trying to stab Williams when she saw the knife in Francis's hand, but she did not actually see him stab at Williams. The prosecutor argued multiple times that Francis swung the knife at Williams. Francis claims that the prosecutor argued that Crow actually saw Francis stab at Williams. But the prosecutor merely argued that Francis attempted to stab Williams, not that Crow saw it happen. And this was not

improper because the prosecutor has wide latitude to assert reasonable inferences from the evidence. *Slater*, 197 Wn.2d at 680.

Fourth, the prosecutor stated during closing argument that Francis told Williams that his knife was going to stab Williams. And because Crow heard Francis state that he was going to kill Williams, one could switch the word "kill" for the word "stab." RP at 996-97. "I mean, even out of the defendant's own sentence, you've got something . . . that comes very close to a threat to kill coming out of the defendant's own mouth." RP at 997. Again, this was not improper because the prosecutor has wide latitude to assert reasonable inferences from the evidence. *Slater*, 197 Wn.2d at 680.

b. Improperly Commenting on Witness Credibility

A prosecutor engages in misconduct when they state a personal belief as to the credibility of a witness. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). The jury determines whether a witness has testified truthfully. *Id.*

First, Francis argues that the prosecutor improperly commented on Francis's credibility when he suggested that Francis knew there was no video camera near where the physical altercation happened. However, no video camera existed there and Francis testified that he had been in the area several times. The prosecutor has wide latitude to assert reasonable inferences from the evidence. *Slater*, 197 Wn.2d at 680. Therefore, the prosecutor did not engage in misconduct.

Second, Francis argues that the prosecutor improperly vouched for Williams's and Crow's credibility when he argued that they were telling the truth because they called the police and Francis did not. The prosecutor argued, "Why in the world, other than your acquaintance was just attacked by somebody who came storming out of the wood line, would you want police

29

involved in that situation, unless what you were about to convey to them was very alarming, very dangerous, and very true?" RP at 1034. Here, the prosecutor is asking a hypothetical question and not speaking directly to Crow's veracity.

However, the prosecutor further argued, "She doesn't have an axe to grind. She's not testifying against the defendant. It's what happened." RP at 1034. This comment arguably constituted misconduct. But Francis did not object to this statement and he does not show that any prejudice was incurable. If he had objected, the court could have stricken the comment and reminded the jury of the instruction stating that the prosecutor's comments were not evidence and that they must disregard any statement not supported by the evidence. Therefore, we hold that Francis waived this prosecutorial misconduct claim.

c.  Shifting the Burden of Proof

Francis argues that the prosecutor shifted the burden of proof when he stated that (1) Francis was guilty because his story did not make sense and (2) there was no question that a knife with a blade less than three inches was per se a deadly weapon.

A prosecutor engages in misconduct if it makes an argument that shifts the State's burden to prove guilt beyond a reasonable doubt. *State v. Osman*, 192 Wn. App. 355, 366, 366 P.3d 956 (2016). However, a prosecutor may point out the improbability of the defense's theory of the case. *Id.* at 367.

First, during closing argument the prosecutor stated, "And I submit to you that his story doesn't make sense. His stories don't make sense when you consider them all together that the factual information that accords with Williams and Crow does make sense. And that's why he's guilty of the crimes in this case." RP at 990. If the prosecutor had merely invited the jury to compare Francis's story with Williams's and Crow's stories to determine whether Francis was

credible, then it would not have been misconduct. *See State v. Jackson*, 150 Wn. App. 877, 885-86, 209 P.3d 553 (2009). But arguably, because the prosecutor stated that the different stories are what made Francis guilty, this improperly shifted the State's burden of proof.

However, Francis did not object to this statement and he does not show that any prejudice was incurable. If he had objected, the trial court could have stricken the comment and reminded the jury of the instruction stating that the State has the burden of proving each element of each crime beyond a reasonable doubt and that the defendant has no burden of proving that a reasonable doubt exists. Therefore, we hold that Francis waived this prosecutorial misconduct claim.

Second, Francis claims that the prosecutor argued that because Francis's knife was less than three inches, it was a per se deadly weapon. But this is not what the prosecutor stated. The prosecutor stated,

> [Y]ou're going to be answering this different question that the law has further defined being armed with a deadly weapon. And it tells you that a . . . knife with a blade less than three inches, whether that's a deadly weapon or not, is a fact for you to decide. Okay? . . . And I submit, we're talking about a quarter inch or a third of an inch in the context of what happened. No question this is a deadly weapon.

RP at 1047-48. The prosecutor was arguing that despite Francis's knife being less than three inches, the jury should still determine that it was a deadly weapon; not that it was a per se deadly weapon *because* it was less than three inches. Therefore, we hold that the prosecutor did not engage in misconduct.

### 3. Ineffective Assistance of Counsel

Francis argues that he received ineffective assistance of counsel when defense counsel failed to request a self-defense jury instruction and for the trial court to consider his convictions as the same criminal conduct for sentencing purposes. We reject this claim.

A defendant who claims that he received ineffective assistance of counsel must show both that (1) defense counsel's representation was deficient, and (2) the deficient representation prejudiced the defendant. *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). Representation is deficient if after considering all the circumstances, the performance falls below an objective standard of reasonableness. *Id.* at 247-48.

We apply a strong presumption that defense counsel's performance was reasonable. *Id.* at 247. Defense counsel's conduct is not deficient if it was based on legitimate trial strategy or tactics. *Id.* at 248. To rebut the strong presumption that counsel's performance was effective, the defendant bears the burden of establishing the absence of any legitimate strategic or tactical reason explaining defense counsel's conduct. *Id.*

First, Francis claims that defense counsel failed to request a self-defense jury instruction despite testimony showing that Francis reasonably feared that Williams would attack him. When asked about a self-defense instruction, defense counsel stated, "No, Your Honor. It's a general denial that . . . [i]n essence, [the State] can't meet the elements under this fact pattern." RP at 890. Because we presume that defense counsel's performance was reasonable and because defense counsel gave a legitimate trial strategy for not requesting a self-defense jury instruction, we conclude that counsel's performance was not deficient.

Second, Francis argues the defense counsel refused to request the trial court to consider his convictions as the same criminal conduct for sentencing purposes. But this assertion relies entirely on matters outside the record. As a result, we cannot consider them on direct appeal. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). This assertion is more properly raised in a personal restraint petition. *Id.* Therefore, we decline to consider this claim.

CONCLUSION

We affirm Francis's convictions, but we remand for the trial court to strike the VPA from the judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

CRUSER, C.J.

CHE, J.